NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0109n.06

No. 09-1096

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Feb 18, 2010**

LEONARD GREEN, Clerk

DARLENE MILLER,                                     )
                                                   )
    Plaintiff-Appellant,                           )
                                                   )
v.                                                 )  ON  APPEAL  FROM  THE  UNITED
                                                   )  STATES  DISTRICT  COURT  FOR  THE
VILLAGE OF PINCKNEY and MICHAEL                     )  EASTERN DISTRICT OF MICHIGAN
SHEPARD,                                            )
                                                   )
    Defendants-Appellees.                          )
                                                   )

Before: BATCHELDER, Chief Judge; SUTTON, Circuit Judge; and WISEMAN, District Judge.[*]

SUTTON, Circuit Judge. Darlene Miller challenges the district court's summary disposition of her excessive-force claim. Because Miller has not shown that Officer Michael Shepard's use of force violated the Fourth Amendment, we affirm.

Late on November 8, 2006, after spending the evening drinking (alcohol), Darlene Miller arrived at her ex-husband's house, unannounced, hoping to see her children. Miller's daughter let her inside, but when her ex-husband discovered she was there, he told her to leave. Miller refused and threatened to kill herself, after which her ex-husband called 911. She left the house.

---

[*]The Honorable Thomas A. Wiseman Jr., United States Senior District Judge for the Middle District of Tennessee, sitting by designation.

The dispatcher sent Officer Alysha Garbacik to investigate the 911 call and asked Officer Michael Shepard to provide back-up. The dispatcher told them both that Miller had threatened suicide and had left the house in a green van.

Shepard arrived at the house before Garbacik and positioned his police cruiser on a nearby street to watch for Miller's van. When he noticed a green van approaching, he turned on his overhead lights, signaling the vehicle to stop. Rather than heed Shepard's command, the van accelerated as it passed the cruiser. Garbacik, who was nearby, saw the van and told Shepard she would follow it. The two agreed that Shepard would stay where he was in case the green van was not the one they were looking for. Garbacik soon radioed Shepard, saying she had stopped the vehicle. After he checked the license plate number to confirm that the van belonged to Miller, he set off to find Garbacik "because [Miller] was suicidal" and he was concerned for "[Garbacik's] safety." R.36-5, 8.

Radio difficulties, however, conspired against Shepard's efforts to find his partner. Shepard became "alarmed" and "worr[ied]" when he could not find Garbacik, who, during a moment when their radios were transmitting, managed to tell Shepard that she needed assistance. Shepard asked central dispatch to locate Garbacik with its computers, but the system was not functioning. The dispatcher then notified Shepard that Garbacik had hit her emergency button. One of Garbacik's radio transmissions eventually came through, and Shepard could hear her say "Apache Trail," the name of a nearby street. Shepard made his way there, where he saw Garbacik's car and pulled up behind it.

Meanwhile, Garbacik was attempting to control Miller. Miller refused to comply with Garbacik's requests, and when asked whether she had alcohol in the van, Miller threw two bottles of Mike's Hard Limeade out the van window toward Garbacik—prompting Garbacik to send the emergency signal. Miller got out of her van and struggled with Garbacik as Garbacik attempted to handcuff her. When Shepard arrived at the scene, Garbacik and Miller were standing close to each other on the driver's side of the van.

The parties dispute some of what happened next, though a videorecording captures most of the encounter. Soon after Garbacik handcuffed Miller from behind, Shepard arrived and dashed toward them. Unaware that Miller had been handcuffed, Shepard raised his arm and struck Miller in the face and throat with his forearm. He forcefully moved Miller to the van and pushed her body up against it. With Garbacik on Miller's left and Shepard on her right, the two officers began escorting her back to the police cruiser. Although Miller claims that Shepard then kneed her to the ground, the video contradicts this account: Miller did indeed fall to the ground, but Shepard's knees remain visible throughout her fall, defeating any suggestion that he forced her down with his knees. *Cf. Scott v. Harris*, 550 U.S. 372, 380–81 (2007). The officers pulled Miller off the ground and put her in Garbacik's cruiser.

Miller pleaded no contest to two counts of resisting and obstructing an officer. *See* Mich. Comp. Laws § 750.81d(1). She then brought a § 1983 claim against Shepard and the Village of Pinckney, alleging that Shepard used unreasonable force during the arrest.

The district court granted summary judgment in favor of Shepard and the city, holding that Shepard's use of force did not violate the Fourth Amendment. Viewing the case "from the perspective of a reasonable officer on the scene," R.60, 14 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)), and considering "only the facts the officers knew at the time of the alleged Fourth Amendment violation," R.60, 15 (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1155 n.3 (6th Cir. 1996))*,* the court determined that Shepard's use of force was not unreasonable, R.60, 15. "Objectively speaking," the court noted, "the force used by Shepard was no doubt greater than necessary in light of the fact that Miller was handcuffed" when he struck her. R.60, 15. But when Shepard arrived at the scene, the court reasoned, he knew only that a "suicidal woman" who had been drinking "had failed to stop her vehicle" and that Garbacik, in pursuing her, "had activated her emergency signal for the first time in years." R.60, 15–16. He had "a few seconds at best" to decide what to do next as he ran to assist Garbacik and, in light of the circumstances, his use of force was not unreasonable. R.60, 16. The court also rejected Miller's remaining claims. The video belied Miller's claim that Shepard kneed her to the ground. R.60, 11. And Miller had "not claimed" "any specific injury" from her allegation that Shepard forced her into the car, and therefore had not shown a genuine factual issue as to whether the action amounted to excessive force. R.60, 17.

Having reviewed the parties' briefs, reviewed the record (including the videotape) and entertained oral argument, we have little to add to the district court's thorough and well-reasoned decision. We therefore rely on that decision in affirming the judgment, save to make two points.

First, Miller's resisting-and-obstructing conviction does not bar her § 1983 claim. *See Heck v. Humphrey*, 512 U.S. 477, 487 (1994). *Heck* precludes plaintiffs from advancing claims under § 1983 that, if successful, "would necessarily imply the invalidity of [a] conviction," *id.*, by "negat[ing] an element of the [criminal] offense," *id.* at 487 n.6. No such problem exists here. A conviction for resisting and obstructing requires two elements: (1) that the defendant ". . . . resists, obstructs, [or] opposes . . . a person;" and (2) that the defendant "knows or has reason to know" that the person "is performing his or her duties [as a police officer]." Mich Comp. Laws § 750.81d(1). Theoretically, then, Miller could have proved that Shepard used excessive force in effectuating her arrest without necessarily undermining her state-court conviction: The necessary elements of her conviction (that she resisted arrest knowing the police were performing their duties) and of her § 1983 claim (that Shepard used excessive force) could coexist.

The analysis does not change simply because the factual predicate for her no-contest plea may have included facts she now disputes, such as the state court's statement that she resisted arrest by "[going] limp" and falling to the ground. R.36-17, 14. The relevant inquiry for determining if *Heck* poses a bar is whether success on her excessive-force claim would necessarily "negate an *element* of the offense," *Heck*, 512 U.S. at 487 n.6 (emphasis added), not whether it would cast doubt on facts the state court might or might not have relied on when accepting the plea. Miller admitted no facts when she pleaded no contest. *See People v. Graham*, 223 N.W.2d 80, 82 (Mich. Ct. App. 1974). And her resisting-and-obstructing conviction could stand based on any number of actions she took that night—from "yelling, screaming, kicking," to "refus[ing] orders." R.36-17, 15; *see* Mich.

Comp. Laws 750.81d (broadly defining the offense as "the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command"). In raising her § 1983 claim, then, she is free to argue (though she does so unconvincingly) that she did not "go limp" without running up against the possibility that success on her claim that Shepard kneed her to the ground might undermine her conviction.

Second, even Miller's best excessive-force argument—that Shepard struck her across the face with his forearm while she was handcuffed—does not state a cognizable constitutional claim. The undisputed facts, as Shepard knew them, justified his actions. In the moments before the incident, Shepard knew that Garbacik had on her hands a woman who had threatened suicide, who had been drinking, who had been involved with a domestic disturbance, who had failed to stop when he activated his emergency lights and who had accelerated past his cruiser. He knew that, after a few minutes of no radio contact with Garbacik, she had activated her emergency signal, a last-resort measure by all accounts. And he knew that, upon pulling up behind Garbacik's unoccupied vehicle and upon not immediately seeing her or Miller, time was of the essence. When he finally saw Garbacik and Shepard through the darkness and the rain, he thus reasonably chose not to pause to assess the situation but immediately to ensure that Miller was restrained and that any threat to Garbacik was alleviated. *Cf. Mann v. Yarnell*, 497 F.3d 822, 827 & n.4 (8th Cir. 2007) (upholding a similar use of force to restrain a noncompliant suspect). Add one more undisputed fact—that Miller did not sustain any objectively serious injuries from the impact—and it becomes clear that

Shepard's "split-second judgmen[t]" "about the amount of force that [was] necessary," *see Graham*, 490 U.S. at 396–97, did not violate the Fourth Amendment.

It is true, as one judge pointed out at oral argument, that Shepard did not *have* to do what he did. He might have yelled to Garbacik as he was racing toward her to make sure she had not yet brought Miller under control. And had he done so, Garbacik might have had the time to yell back that she already had handcuffed Miller. But to acknowledge, from the safety of our chambers and after hours of reflection, that an officer might have behaved more reasonably does not suffice to establish a cognizable excessive-force claim. An officer's use of force does not become constitutionally unreasonable merely because, after the dust has settled, we can imagine a more reasonable way for responding to an officer in need. *See Illinois v. Lafayette*, 462 U.S. 640, 647 (1983) (reasonableness of government activity does not hinge on the existence of a less-intrusive alternative). What matters is whether "a hypothetical reasonable officer" on the scene "would . . . have known that his actions, under the circumstances, were objectively unreasonable." *Scott v. Clay County*, 205 F.3d 867, 877 (6th Cir. 2000); *see also Graham*, 490 U.S. at 396–97. As a matter of law, Miller cannot meet this standard.

For these reasons and those stated in the district court's opinion, we affirm.