NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0356n.06
Filed: May 17, 2006

No. 05-3652

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FRANK THACKER,                              )
                                            )
    Plaintiff-Appellant,                   )
                                            )
v.                                          )  ON APPEAL FROM THE UNITED
                                            )  STATES DISTRICT COURT FOR THE
LAWRENCE COUNTY, OFFICER                    )  SOUTHERN DISTRICT OF OHIO
RANDALL GOODALL, and OFFICER                )
AARON BOLLINGER,                            )
                                            )  OPINION
    Defendants-Appellees.                  )
_____ )

Before: SUHRHEINRICH, GILMAN, and ROGERS, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** Following his arrest for disorderly conduct, Frank Thacker sued Lawrence County and two sheriff's deputies based on their alleged violation of his constitutional rights. Thacker claimed that the deputies arrested him without probable cause, used excessive force, and deprived him of his liberty without due process of law. The district court granted the defendants' motion for summary judgment, holding that no violation of Thacker's constitutional rights had occurred and that the deputies were entitled to qualified immunity. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

**A.      Factual background**

*1.      Early morning fire*

Around 5:00 a.m. on the morning of July 2, 2002, Thacker was sleeping on the couch at his ex-wife's house in rural Ohio. His own residence had burned down six weeks earlier, and his ex-wife had allowed him to stay with her. His Freightliner truck and his dump truck had also been recently burned, the latter as it sat in the driveway of his ex-wife's residence. Thacker believed that someone was setting these fires intentionally.

On the morning in question, Thacker awoke to the sound of dogs barking. He looked out the window and saw that the barn was on fire. The barn housed two horses. Thacker yelled for his ex-wife to get up and call the fire department. He ran from the house toward the barn, taking a rifle and ammunition. He said that his reason for taking the gun was to have a means to shoot the horses in the event that he could not free them from the burning barn. On the way to the barn, which was 150 to 200 yards from the house, Thacker loaded the rifle.

Thacker got to the barn, which was then engulfed in flames, and set down the rifle. He ran in and out of the building several times and was able to free the two horses, one of which eventually died from burns received in the fire. Once firefighters arrived at the scene, Thacker again picked up the rifle.

Among the firefighters to arrive at the scene, Thacker recognized Volunteer Fire Chief Joseph Adams from the previous fires. Thacker approached Adams and asked that Adams see to it that the fire marshal was called. Adams testified that he asked Thacker to put away the gun, but that Thacker did not do so. This lack of compliance with his request did not concern Adams, however, and he went on to attend to other things at the scene. Thacker does not recall Adams ever asking him to put the gun away.

The firefighter in charge of the scene was Captain James Woda because he was the first to arrive. Four or five minutes after Adams allegedly asked Thacker to put the gun away, Woda approached Adams. Woda discussed with Adams whether they should call the sheriff's office because Thacker had a firearm. The fire department has a policy in place whereby firefighters will call the sheriff in the event that someone on the scene of a fire possesses a gun. Woda ultimately did place a call to the sheriff, reporting a man with a gun.

At some point between the arrival of the firefighters and the arrival of the sheriff's deputies, Thacker was joined outside by his ex-wife, his 13-year-old son, his 17-year-old daughter, and the daughter's boyfriend. They all stood together talking and watching the firefighters do their job. Nine firefighters had arrived in at least two fire trucks and were working to control the blaze. The family stood out of the way of the firefighters, with Thacker holding the rifle against his shoulder. The stock of the rifle was in his right hand and the barrel pointed up.

### 2. *Arrival of the sheriff's deputies and the arrest of Thacker*

Two sheriff's deputies arrived on the scene shortly thereafter. Thacker and the deputies present differing accounts of some key facts from this point forward. Because the standard of review on appeal requires that we construe any disputes about the relevant facts in Thacker's favor, the recitation that follows is solely from his point of view.

Thacker claims that when the deputies arrived, he was upset about the fires, but was calm overall and not yelling or screaming. He further said that he was standing around and talking with his family away from the firefighters. The two deputies, Randall Goodall and Aaron Bollinger, approached Thacker.

Thacker claims that "[a]ll in one motion, one of the deputies asked me who was I, and what I was doing with this, as he grabbed, unexpectedly, the rifle out of my hands." He said that the deputies did not give him a chance to respond to their questions before they took the rifle from him. Furthermore, Thacker insists that neither of the deputies asked Thacker for the rifle before they snatched it from him. Thacker testified that he did not resist the deputies taking the gun or try to jerk it out of their reach.

The manner in which the deputies took the rifle upset Thacker. He began "cursing," "raised his voice," and said: "Rather than you-all down here harassing me over this, you need to go arrest the person that's doing this. This is the fourth fire I've had in like five weeks." In response, one of the deputies said, "You need to calm down." Thacker replied: "No, I do not need to calm down. You-all need to do something about this . . . ." Although he admits cursing after his rifle was taken from him, Thacker says that he did not curse before that point.

Bollinger moved behind Thacker and grabbed him, placing his forearm across Thacker's neck. Thacker denies that Bollinger told him that he was under arrest. At the same time, Goodall reached for Thacker's arms and pulled him forward. The three men then fell to the ground. Thacker claims that he was taken down to the ground without warning and that he did not struggle until he was already on the ground.

Once on the ground, however, a scuffle ensued. Thacker had his hands in front of his body and was resisting the deputies' attempts to pull them around behind his back. He then realized that the deputies were trying to handcuff him, so he told them that if they would let him stand up, they could put the handcuffs on him. All three of the men then stood up, Thacker put his hands behind

-4-

his back, and the deputies handcuffed him. Thacker claimed that "they were being extremely rough at that point."

The deputies took Thacker to the sheriff's cruiser. Because the vehicle was parked close to a large tree, the rear passenger door through which Bollinger intended for Thacker to enter would not open all of the way. Thacker told the deputy that there was not enough of an opening for him to slide into the back seat. Bollinger said that there was enough of an opening and, according to Thacker, Bollinger "unexpectedly pushed me into the cruiser" through the narrow opening. This caused Thacker to cut his right forearm on the latch of the door. According to Thacker, the cut was approximately 2.5 inches long and "rather deep."

Thacker's ex-wife asked one of the deputies why they were taking Thacker to jail. The deputy replied that Thacker was going to jail because of what had just transpired. Thacker's ex-wife then told the deputies that they did not need to take him to jail. She testified that Officer Goodall "told me to be qui[et]. Otherwise, he would take me to jail too. I said, what for? Officer Goodall said, I'm telling you, if you say one more thing, I'll take you with me to jail. I can take two of you to jail as easy as I can take one." She did not say anything further and the deputies left with Thacker in custody.

Thacker was taken to the sheriff's station where he was booked into the jail and placed in a cell. The deputies had arrested Thacker for disorderly conduct that they had allegedly witnessed at the scene of the fire. During the booking process, Thacker showed his wound to Bollinger and the booking officer. They gave him a paper towel to clean the cut and also took pictures of the wound. Thacker's ex-wife posted bond for Thacker and picked him up from jail 6 or 7 hours after his arrest. No charges were ever filed against Thacker arising from the events on July 2, 2002.

Because Thacker did not have any medical insurance, he did not go to the hospital or see a doctor for treatment of the cut. Instead his ex-wife, who had 20 years of experience as a licensed practical nurse, treated the wound. He still has a scar from this wound on his forearm.

## B.    Procedural background

Thacker brought suit against the defendants for the alleged violations of his right to be free from an unreasonable seizure, from the use of excessive force, and from the deprivation of his liberty without due process, all pursuant to 42 U.S.C. § 1983. In addition to these constitutional claims, he alleged that the deputies wrongfully imprisoned him in violation of state law.

All three defendants moved for summary judgment. The district court found that "Thacker's version of the facts is not materially different from those expressed by the Defendants." Based on those "undisputed" facts, the district court determined that (1) Thacker failed to present a viable claim against Lawrence County, and (2) that the deputies were entitled to qualified immunity because they did not violate Thacker's constitutional rights. It therefore dismissed Thacker's complaint. Thacker timely appealed, raising issues only as to his claims against the deputies in their individual capacities.

## II. ANALYSIS

## A.    Standard of review

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.      The law of qualified immunity**

In determining whether a law enforcement officer is shielded from civil liability due to qualified immunity, this court typically employs a two-step analysis: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In addition to the two steps listed above, this court occasionally considers a third step in the qualified immunity analysis. *See id.*, 408 F.3d at 310 n.2 ("Panels of this court occasionally employ a three-step qualified immunity analysis, as opposed to the two-step analysis set forth here. . . . [B]oth the two-step approach and the three-step approach can be said to capture the holding of [*Saucier*].") (citations omitted). When utilized, this third step requires inquiry into "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (citation and quotation marks omitted).

The Supreme Court since *Saucier* has continued to analyze qualified immunity using the two-step approach, but this court has noted that "the three-step approach may in some cases increase the clarity of the proper analysis." *See Estate of Carter*, 408 F.3d at 311 n.2. If, on the other hand, the case at issue "is one of the many cases where, if the right is clearly established, the conduct at

issue would also be objectively unreasonable," then this court has "collapse[d] the second and third prongs" in an effort to "avoid duplicative analysis." *Caudill v. Hollan*, 431 F.3d 900, 911 n.10 (6th Cir. 2005).

Throughout the analysis, the burden is on Thacker to show that the deputies are not entitled to qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) ("Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity."). In this case, the district court utilized the typical two-step analysis and concluded that the deputies did not violate Thacker's constitutional rights. It therefore held that they were entitled to qualified immunity. Thacker appeals the district court's order granting summary judgment as it relates to two different alleged constitutional violations: (1) whether there was probable cause to arrest Thacker, and (2) whether the deputies utilized excessive force in arresting him.

**C.      Whether there was probable cause to arrest Thacker**

Thacker was arrested for engaging in disorderly conduct. In order for such an arrest to survive constitutional scrutiny, the deputies must have had probable cause to believe that Thacker committed the offense. *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam) (holding that officers were entitled to qualified immunity if "a reasonable officer could have believed that probable cause existed" to make the arrest). In determining whether the deputies had probable cause to arrest Thacker for disorderly conduct, we must decide whether, "at that moment [of the arrest,] the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

The offense of disorderly conduct is detailed in the Ohio Revised Code, with the relevant

portions set forth below:

> No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:
>
>> (1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;
>>
>> (2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person;
>>
>> (3) Insulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response;
>>
>> . . . .
>>
>> (5) Creating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender.

Ohio Rev. Code § 2917.11 (A). There is no way to know which subsection of the disorderly conduct

statute the deputies relied upon to arrest Thacker because he was not ultimately charged with the

offense and because the deputies' affidavits do not address the issue. But the deputies' brief makes

arguments as to each of the subsections quoted above. We need not analyze the subsections one by

one, however, because we conclude that the deputies had probable cause to arrest Thacker for

"turbulent behavior" under Ohio Revised Code § 2917.11 (A)(1).

The deputies rely on the following four facts conceded by Thacker to demonstrate probable

cause to arrest him under that subsection: that he (1) raised his voice, (2) swore at the deputies,

(3) continued to swear at them after he was asked to calm down, and (4) was visibly upset.

According to *State v. Jackson*, No. 17128, 1998 WL 801367, at *3 (Ohio Ct. App. Nov. 20, 1998)

(unpublished), "[o]ne may be found to have engaged in turbulent behavior pursuant to [subsection

(A)(1)] based upon the loudness or aggressiveness of the speech, rather than its content." The *Jackson* court held that the deputies in that case had probable cause to arrest Jackson for disorderly conduct where Jackson confronted the manager of a store and sheriff's deputies "loudly and hostilely," failed to calm down after the deputies requested that she do so, refused to leave the store when asked to do so, and grabbed at a deputy's name tag. *Id*. at *4. According to the court, this conduct "was turbulent and caused inconvenience, annoyance, or alarm to another." *Id*.

Accepting Thacker's version of the disputed facts as we must, we can conclude that he had raised his voice, but was not screaming when the officers arrested him. He does admit, on the other hand, that he was swearing loudly and did not cease this behavior after the deputies requested that he do so. In light of these admissions, a prudent deputy could have believed that Thacker was violating subsection (A)(1) based on the volume and aggressive delivery of his speech, coupled with his failure to calm down despite the deputies' request. *See Beck*, 379 U.S. at 91 (setting forth the probable cause standard); *Jackson*, 1998 WL 801367, at *3 (stating that a punishment under subsection (A)(1) for turbulent behavior can be predicated on the aggressiveness and volume of speech, as opposed to its content). Thacker has therefore failed to demonstrate that the deputies lacked probable cause to arrest him under this subsection. *See Silberstein*, 440 F.3d 311 (placing the burden on the plaintiff to demonstrate that the government officials are not entitled to qualified immunity). In light of the fact that Thacker has failed to prove that the deputies engaged in unconstitutional conduct, there is no need for us to perform the second step of the qualified immunity analysis—that being "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

**D.      Whether the deputies utilized excessive force in arresting Thacker**

Separate and apart from Thacker's claim that he was arrested without probable cause is his argument that, regardless of whether the deputies were justified in arresting him, they did so in an unreasonable manner that utilized excessive force. The Supreme Court has clarified that the standards are the same for evaluating a claim based on the right to be free from unreasonable searches as for a claim of excessive force. *Graham v. Connor*, 490 U.S. 386, 394 (1989) (holding that the standard for an excessive-force claim brought under 42 U.S.C. § 1983 is determined by the particular constitutional right at issue, which in the case of an arrest is usually the prohibition against unreasonable seizures of the person embodied in the Fourth Amendment).

The Fourth Amendment prohibits the use of excessive force by an arresting officer. *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005). The test for what constitutes excessive force is objective—"whether the officers' actions are 'objectively unreasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). This court has held that "the proper application of the reasonableness inquiry requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (quoting *Graham*, 490 U.S. at 396). These three factors are not an exhaustive list—rather, "the ultimate question is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Id*. (quoting *Graham*, 490 U.S. at 396). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396).

Thacker alleges three separate instances of excessive force: (1) when Officer Goodall snatched the rifle out of Thacker's hands, (2) when the deputies "wrestled [Thacker] to the ground" in an attempt to handcuff him, and (3) when Officer Bollinger pushed Thacker into the cruiser, causing his arm to be cut in the process. He makes no attempt to cite analogous authority in support of his claims, but instead repeatedly alleges with respect to each claim that "[a]ll three *Graham* factors point out that no force was necessary." We will address each claim in turn.

### 1. *Taking the rifle from Thacker*

The seizure of personal property by law enforcement officials is unconstitutional if accomplished by the use of excessive force. *Collins v. Nagle*, 892 F.2d 489, 497 (6th Cir. 1989) (acknowledging the validity of an excessive-force claim for the seizure of property, but granting qualified immunity because the force used against the plaintiffs was not excessive and therefore did not amount to a constitutional violation). In the present case, the deputies arrived while Thacker was allegedly talking with his family. Thacker says that the deputies approached, asked who he was and what he was doing with the rifle, and snatched it unexpectedly out of his hands, all before he had a chance to respond. According to Thacker, only after this incident did he raise his voice and use profanity with the deputies.

The scene was chaotic when the deputies arrived, with nine firefighters in two trucks battling the blaze. In light of the 911 call reporting a man with a gun that prompted their arrival, the deputies had a legitimate concern for the safety of those in the area, as well as for their own safety. When they encountered Thacker with the rifle, they made an on-the-spot judgment to take the gun first and get answers to their questions later. Although the handling of this situation might not have been a

-12-

model of appropriate police conduct, we cannot conclude that the taking of the rifle constituted the use of excessive force.

### 2. Wrestling Thacker to the ground while attempting to handcuff him

After the deputies took the rifle from Thacker, he became upset, raised his voice, and was swearing. Thacker did not calm down despite the deputies' request that he do so. The parties dispute whether the deputies told Thacker that he was under arrest. Thacker claims that they did not. Even so, the record reflects that the deputies were not attempting to tackle Thacker into the dirt simply for the sake of tackling him. Rather, both deputies attempted to reach for Thacker to restrain him, and the three men fell after each deputy tried to pull Thacker in a different direction.

The crime of disorderly conduct is not a violent or serious crime, and this fact weighs in favor of using less force in arresting Thacker. But the deputies were attempting the arrest of an upset, loud, and swearing individual who refused to calm down. Under these circumstances, the deputies did not utilize excessive force in reaching for Thacker and trying to place him in handcuffs. This constitutional application of force ultimately caused all three men to fall to the ground where a struggle ensued, but that unfortunate result does not render the actions of the deputies unconstitutional. Once the men were on the ground struggling, the deputies were within their rights to continue their attempts to restrain Thacker because he admits that was resisting the deputies. The deputies therefore did not violate Thacker's constitutional rights in the way that they carried out his arrest.

### 3. Pushing Thacker into the cruiser

After Thacker was handcuffed, the deputies took him to the cruiser. Despite being told by Thacker that there was not enough room for him to slide into the back seat through the narrow

-13-

opening, Officer Bollinger "unexpectedly pushed" him in. Thacker cut his arm on the door latch as he entered the vehicle.

Just before Bollinger pushed Thacker into the cruiser, there had been a heated exchange where Thacker raised his voice and was swearing at the deputies. A struggle ensued, resulting in Thacker eventually being handcuffed. Considering the totality of the circumstances, Thacker has failed to show that Bollinger utilized excessive force by pushing him into the cruiser. The record reflects that the unfortunate wound suffered by Thacker in this case was simply the unexpected and unintended consequence of being placed in the car.

In sum, Thacker has failed to demonstrate that the deputies violated his constitutional right to be free from an unreasonable seizure and from excessive force. The record simply does not reflect that the deputies acted in a plainly incompetent manner or that their actions were objectively unreasonable. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986) (holding that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law"). They are therefore entitled to qualified immunity. *See Estate of Carter*, 408 F.3d at 310-11 (citing *Saucier*, 533 U.S. at 201) (setting forth the qualified immunity analysis).

**E.      Whether the district court properly dismissed Thacker's state-law claims**

In addition to his claims for the alleged constitutional violations brought pursuant to § 1983, Thacker contends that he was falsely imprisoned in violation of state law. After the district court properly dismissed all of Thacker's federal claims, it declined to maintain supplemental jurisdiction over the state-law claim and dismissed it. Such a dismissal was proper and in accordance with the usual course of proceedings in this circuit. *See Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891,

-14-

900 (6th Cir. 2001) ("[T]he usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment.")

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.