NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0506n.06

No. 15-1730

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| KEVIN LAURY, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| MATTHEW RODRIGUEZ; STEVEN CAMPBELL; | ) |
| BRIAN PRICE; DAVID HUFFMAN, | ) |
| | ) |
| Defendants-Appellees. | ) |

**FILED**
Aug 25, 2016
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE: KEITH, CLAY, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Kevin Laury appeals the district court's grant of summary judgment to the four Defendant police officers on Laury's claims alleging excessive force during the booking process in violation of 42 U.S.C. § 1983.[1] We **AFFIRM in part, REVERSE in part,** and **REMAND** for further proceedings consistent with this opinion.

**I.**

On the evening of April 25, 2013, Warren police officers Brian Price (Price) and David Huffman (Huffman) stopped Laury's car for running a red light. (Laury Dep., PID 139; Price Dep., PID 191; *see also* Dash-Cam Video 1A, 21:31:36-39.) Laury's friend Devonte Campbell (Devonte)[2] and two women whom they had met that evening on the internet were also in the

---

[1] The district court also addressed a potential deliberate-indifference claim. However, Laury does not challenge the dismissal of that claim on appeal.

[2] This case involves Laury's friend Devonte Campbell and Officer Steve Campbell. For clarity, we refer to them as Devonte and Officer Campbell, respectively.

vehicle. (PID 139-40.) Price approached the driver's window, asked Laury some preliminary questions, and then asked Laury to step out of the vehicle. (Dash-Cam Video 1A, 21:32:17-40, 21:32:49-21:33:25.)

After Laury exited the vehicle, Price conducted a pat down and found a pill in Laury's pocket that Laury admitted was Ecstasy. (*See* Laury Dep., PID 141-42.) Price then handcuffed Laury, put him in the squad car, and searched the passengers. (PID 142.) Laury testified on deposition that he did not know he had the pill, and that he had put on Devonte's pants earlier that evening. (PID 141.) At some point, Devonte told the officers the pill was his. (PID 142.)

The officers also arrested Devonte. (PID 142.) At the police station, Devonte told the officers he was high on Ecstasy, (D. Campbell Dep., PID 175), and Laury testified on deposition that Devonte was acting anxious and hyper. (PID 143.)

The parties dispute whether Laury consumed alcohol that evening and whether there was alcohol in the car. Huffman and Price testified at their depositions that Laury and Devonte smelled of intoxicants, and according to Huffman, Laury admitted that he had been drinking earlier that evening. (Huffman Dep., PID 211-12; Price Dep., PID 192.) However, both Laury and Devonte denied consuming alcohol that evening, and although Devonte suggested in his deposition Laury may have told the officers he was drinking, Laury denied saying that to the officers. (*See* D. Campbell Dep., PID 169; Laury Dep., PID 141.) There was a red solo cup in the center console of the back seat, which both Devonte and Laury testified was used as an ashtray. (PID 141,172; *see also* PID 211; PID 192.) However, Huffman testified that Laury told the officers there was alcohol in it, and that he smelled alcohol in the cup. (PID 211.)

A video from inside the officers' cruiser shows that while sitting in the cruiser and on the way to the police station, Laury argued with the officers about his arrest, stating that he was not

drunk, that he did not run a red light, and that he believed he was being racially profiled; however, he did not make any threats of physical harm against the officers. (*See* In-Car Video 2A, 22:08:35-22:16:50; 22:17:10-22:20:06; 22:29:54; 22:34:07-29; *see also generally* Laury Dep., PID 143-44.) Devonte testified on deposition that in the cruiser, he and Laury were "talking junk," but that they did not make any threats. (PID 175.) Devonte also testified that Laury said to one of the officers, "If these handcuffs was off, you won't be talking tough," (*id.*); Laury admitted saying to Price, "Yeah, you a tough guy when I got these cuffs on," but testified that he said this at the jail. (PID 146.)

Once at the jail, the officers took Laury and Devonte to be booked. Huffman left the elevator earlier than Price, Laury, and Devonte, and had no further contact with Laury. (*See generally* Big Bus Elevator Video; Laury Dep., PID 144-45.) Price then instructed Laury and Devonte to sit on a bench in the booking area and asked them standard booking questions. (PID 145.) Laury testified that they were handcuffed at the time, that his handcuffs were cutting his wrists, and that he asked Price to loosen them, but Price ignored him. (*Id.*) As a result, Laury began to ignore Price's questions, and "kind of got smart with him and told him [he] didn't want to say" anything. (*Id.*)

Devonte testified at his deposition that at the jail, Laury was angry and cursing at the officers and Laury admitted that he continued to argue with Price about his arrest. (PID 175-76; PID 145.) Laury also admitted that he attempted to maneuver his handcuffs to the front of his body because they were too tight. (PID 146; *see also* Booking Room Video NE, 10:42:44-10:43:00.) Upon seeing this, Price walked over to stop Laury. (*See* Booking Video NE, 10:42:49-10:43:03; Booking Video NW, 10:42:58.) Price then continued the booking process.

(Booking Video NE, 10:50:06-10:52:01.) After searching Laury's pockets, Price removed Laury's handcuffs.[3] (*Id.*, 10:52:50-10:54:37.)

As Price removed Laury's handcuffs, he held one of Laury's hands behind Laury's back while Laury's other hand was on his head. (Booking Video NE, 10:54:37-10:55:05.) Price contended he did so because Laury began to turn towards him, rather than follow Price's instruction to place his hand on his head. (PID 196.) Laury testified on deposition that he neither moved his arms while the handcuffs were being removed nor threatened Price. (PID 146.) Laury then sat back down. (Booking Video NE, 10:55:05-11.)

According to Laury, once he was seated, Price asked him to remove his coat and hand it to him without standing. (PID 146.) The booking-room videos show Laury stand, but remain directly in front of the bench, remove his coat, and toss or "fling" it to Price, who is approximately a foot or two away, then sit back down. (Booking Video NE, 10:55:11-19.) Although part of the jacket is near Price's face, Price catches it in mid-air and it is unclear from the videos whether it obstructed his view. (*See* Booking Video NW, 10:55:17-18.)

The videos then show the following. As Laury sits back down, Price moves quickly towards Laury and holds him down on the bench. (Booking Video NE, 10:55:19.) Price appears to put his hands near Laury's head or neck. (Booking Video NW, 10:55:19-20.) Price then maneuvers Laury onto his back on the bench, at which point Price is on top of Laury; as this happens, Devonte—who was sitting next to Laury—stands to move out of the way. (Booking Video NE, 10:55:19-10:55:24.) Laury does not appear to struggle. (*See* Booking Video NW,

---

[3] Defendants-Appellees contend that "Officer Price had attempted to remove Laury's handcuffs 10 minutes prior but stopped because Laury ignored orders to place his hands on his head and turned threateningly in turn toward Officer Price." (Appellees' Br. 9 n.7.) However, the video has no sound, and the portion of the deposition cited refers to the timeframe when Price took off Laury's handcuffs, not ten minutes earlier. (*See* Price Dep., PID 196.)

10:55:22-30.) During this time, Officer Campbell enters the room, and moves Devonte further out of the way. (Booking Video NE, 10:55:24-27; *see also* S. Campbell Dep., PID 261.) Laury testified at his deposition that Price "put his hands around [Laury's] neck, and started choking [him] against Devonte Campbell," and continued to choke him when Devonte moved out of the way. (PID 146-47.)

The videos then show Price taking Laury from the bench to the floor, still on top of him. (Booking Video NE 10:55:30-31.) Price appears to hold Laury down with his knee on Laury's back, and his hands near Laury's upper back or head. (Booking Video NE, 10:55:31-33; Booking Video NW, 10:59:30-38.) Although Laury does not appear to struggle, Price keeps his knee on Laury's back. (Booking Video NE, 10:55:33-48.) Shortly thereafter, Rodriguez—who had entered the booking room during the scuffle—walks toward Laury and Price and kneels down near Laury's head. (Booking Video NE, 10:55:48-59; *see also* Rodriguez Dep., PID 251.) Price and Rodriguez hold Laury down. (Booking Video NW, 10:55:50-10:56:01.) Rodriguez then leaves and returns with a restraint chair. (*See* Booking Video NE, 10:56:11-10:56:58; PID 251.) Price thereafter gets off Laury's back, but Officer Campbell stands over Laury; Laury is still not moving and appears to be handcuffed. (Booking Video NE, 10:56:58-10:57:02.) Although Laury does not appear to move, Price again puts his knee on Laury's back. (Booking Video NE, 10:57:06-10:57:16; *see also* Booking Video NW, 10:57:01-06.)

According to Laury, Price "slam[ed him] on the ground" from the bench. (PID 147.) Once on the ground, Laury contends Price bent his arms "all the way" behind his back, "put[] his knee in [Laury's] back," and later, a second officer he could not see came and "put[] his boot on the side of [Laury's] head, [and] pushed down on it." (*Id.*) Laury also testified that at this point,

he was not arguing or resisting, and that during this altercation, Price "snatched" his earring out of his ear. (PID 149.)

The videos then show Price and Officer Campbell pick Laury up off the floor and put him in the restraint chair, and three officers strap Laury into the chair. (Booking Video NE, 10:57:40-10:59:13.) Initially, Laury appears to struggle, (Booking Video NW, 10:57:54-56), and Devonte testified on deposition that as Laury went into the restraint chair, he was yelling and squirming, (PID 178). Laury testified that as the officers strapped him into the chair, Price said something like, "You all know not to bring that shit over here on the other side of Eight Mile," and another officer said, "Welcome to Warren." (PID 147.) Laury also testified that he asked officers to wipe his face because he had blood coming from a scratch on his head and ear. (PID 149.) The video also shows that after Laury is taken away in the restraint chair, a janitor arrives to clean what appears to be blood from the area of the floor where Price had restrained Laury on the ground. (Booking Video NE, 11:04:18-53.)

Laury remained in the restraint chair for a few hours, during which time he asked officers—including Price—to wipe his face and loosen his restraints, and told them his head was spinning and his hand was numb. (PID 149-50.) According to Laury, none of the officers did anything to help, and one said if he did not shut up, he would be there longer. (*Id.*) Later, Laury was taken out of the restraint chair and placed in a holding cell. (*Id.*)

Appellees dispute Laury's account. According to Price, after Laury "threw" his jacket in Price's face, Price had a "limited view," and "saw [Laury] begin to bend down." Based on Laury's prior comment and these actions, Price "believed that an assault was going to occur," and that Laury "was going to head butt [him] across the room or attempt to drag [Price] on top of him onto the bench." (Price Dep., PID 196; *see also* PID 199.) Price testified that he used

pressure points behind Laury's ear and under his jaw to gain control of Laury, and that while on the ground, his knee was across Laury's back "securing him on the ground." (PID 197, 200.)

Rodriguez testified at his deposition that Laury and Devonte had been "cursing back and forth," not complying with orders, and disrupting the booking process, and that while the struggle ensued, Devonte "kep[t Laury] agitated." (PID 251.) Officer Campbell testified that Laury was "obviously being combative and not following Officer Price's directions," and that Devonte was "[b]eing loud and boisterous and [encouraging Laury] to continue being combative toward Officer Price." (PID 261-62.) Devonte testified that as the struggle ensued, everybody was yelling and screaming, but because there was so much commotion, he could not hear much. (PID 177.)

Laury was later processed by non-party officers without incident. (PID 151.) He was charged with possession of Ecstasy, resisting and obstructing a police officer, reckless driving, and having open intoxicants in a motor vehicle. (Felony Compl., PID 272.) Laury pleaded guilty to possession of Ecstasy and was placed on probation. (PID 152-53).

**II.**

We review de novo the district court's grant of summary judgment. *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is appropriate if, viewing the facts in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). Where there is a video of the relevant events, we accept the plaintiff's version of the facts to the extent it is not "blatantly contradicted" by the video. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

### III.

On appeal, Laury alleges claims arising out of the altercation in the booking room, excessively tight handcuffing, and use of the restraint chair. We address each in turn.

#### A. Booking-Room Altercation

Arrestees have a clearly established right to be free from excessive force.[4] *See Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001). We analyze excessive-force claims under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). In conducting this inquiry, we look to "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396; *see also Burgess v. Fischer*, 735 F.3d 462, 472–73 (6th Cir. 2013). Because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," the reasonableness of an officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97. Laury asserts excessive-force claims against Officers Price, Rodriguez, and Campbell based on the initial altercation in the booking room.

#### 1. Price

Laury contends that Price used excessive force when he pushed Laury onto the bench and choked him, "slammed [Laury] face-first onto the ground," and while Laury was on the ground, pressed his knee into Laury's back, "applied pressure to [Laury's] neck and head," and ripped

---

[4] As the parties agree, the Fourth Amendment applies to Laury's claims. *See Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 537 (6th Cir. 2015) ("Fourth Amendment protections extend through police booking until the completion of a probable cause hearing.") (citing *Aldini v. Johnson,* 609 F.3d 858, 866–67 (6th Cir. 2010)).

Laury's earring out of his ear. (Laury Br. 23.) We consider these acts in two segments: 1) the initial takedown, encompassing Price's decision to push Laury onto the bench, choke him, and take him down to the floor face-first, and 2) Price's actions once Laury was on the floor.

### a. Takedown

Viewed in the light most favorable to Laury, there is a question of fact whether Price's actions were objectively reasonable. "[P]eople who pose no safety risk to the police [have a right] to be free from gratuitous violence during arrest." *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 608 (6th Cir. 2006) (quoting *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006)). The facts viewed in Laury's favor do not support Price's argument that a reasonable officer would have perceived Laury as a threat.

Laury was arrested for operating a vehicle while intoxicated and possession of Ecstasy— "not a severe offense that would support a greater use of force." *See Lustig v. Mondeau*, 211 F. App'x 364, 370 (6th Cir. 2006). And according to Laury, although he argued with officers about his arrest, the only arguably "threatening" comment he made was telling Price, "Yeah, you a tough guy when I got these cuffs on." (*See* Laury Dep., PID 146.) That Price took Laury's handcuffs off after Laury said this suggests a reasonable officer would not necessarily have viewed this comment as a threat. Moreover, although Laury attempted to put his handcuffs in front of his body, he testified that he did so as a result of discomfort—about which he had complained to Price—and the video shows he stopped maneuvering his arms as soon as Price came over to him, and did not do so again before Price took off his handcuffs. (*See* Booking Video NE, 10:42:44-10:54:37.) A reasonable factfinder could view these actions as "argumentative at worst," rather than threatening. *See Malory v. Whiting*, 489 F. App'x 78, 83 (6th Cir. 2012).

Further, a reasonable officer would not necessarily have viewed Laury's act of tossing or "flinging" his jacket at Price as a threat. Price asked Laury to give him the jacket, and although he asked Laury to remain seated, Laury stood up only briefly without moving from the bench, tossed his jacket to Price, then sat back down. (Booking Video NW, 10:55:16-20.) Even assuming this was "somehow provocative, it was not so obviously aggressive to warrant brute physical force." *See Malory*, 489 F. App'x at 84 (addressing officer's argument associating the plaintiff's "act of placing a . . . belt on his shoulder with 'taking an attack stance'"). And although Price contends the jacket obscured his view, that is not clear from the video. (Booking Video NW, 10:55:16-20.) Nor does the fact that Laury was not handcuffed render Price's actions objectively reasonable. *See Baker*, 471 F.3d at 607–08 ("That Baker was not handcuffed at the time he was struck does not preclude a finding of unreasonableness."); *Malory*, 489 F. App'x at 85 (rejecting argument that the right to be free from excessive force once subdued was not clearly established because the plaintiff was not handcuffed).

And, even if some force were justified, a factfinder could conclude that by pushing Laury onto the bench, choking him, and "slamming" him onto the floor face-first, Price "gratuitously applied additional force, which inflicted pain . . . against an individual who posed no threat to safety, did not attempt to flee, offered at most passive resistance to the officers, and was already under the officer[']s[] physical control." *Lustig*, 211 F. App'x at 371; *see also Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 404, 412 (6th Cir. 2015) (finding officer's conduct not objectively reasonable where jail video showed him "pushing a handcuffed [arrestee] face-first into a wall," notwithstanding that the arrestee had "made verbal threats against the officers from the moment he exited the patrol car at the jail," and was spitting on the officers, because the arrestee was handcuffed and not physically resisting at the time force was used).

Relying on *Abdul-Khaliq v. City of Newark*, 275 F. App'x 517, 521 (6th Cir. 2008), Appellees contend Price's actions were objectively reasonable because Laury was verbally aggressive and "made a physical gesture toward an officer . . . that was reasonably construed as threatening." (*See* Appellee Br. 20.) In *Abdul-Khaliq*, however, the "physical gesture" at issue was the plaintiff lifting his jacket, which the officers interpreted as aggressive because they believed he had a gun. 275 F. App'x at 519. The court found the officers' actions objectively reasonable because the plaintiff "admit[ted] to angry yelling and cursing at the officers, carrying on a prolonged and heated debate about whether or not he had a gun, and vigorously opening his coat in a gesture toward the police officers." *Id.* at 521. Here, Laury admits to arguing with officers about his arrest, but the only arguable threat he admits making was to tell officers that they were "tough guys" while he had handcuffs on. There was no debate, as in *Abdul-Khaliq*, as to whether Laury had a gun or any other weapon. Indeed, "flinging" a jacket at an officer who asks for it during booking—after having been searched several times—is surely less aggressive than opening one's jacket when officers believe the person to be armed.

Nor is this case similar to *Lee v. Hill*, No. 12-cv-10486, 2013 WL 5179059 (E.D. Mich., Sept. 12, 2013), because there, the plaintiff did not "refute that he reacted violently" towards the officers, or that he resisted their attempts to subdue him. *Id.* at *6. Further, the *Lee* plaintiff's act of flinging his boots at a deputy (the boots hitting the deputy in the face) while en route to another area is distinguishable from Laury's act of flinging his coat at the officer who had asked him for the coat. *See id.* at *2.

Citing *Thacker v. Lawrence Cty.*, 182 F. App'x 464, 472 (6th Cir. 2006), Appellees also contend Price's actions were reasonable because "wrestling to the ground 'an upset, loud, and swearing individual who refused to calm down' is not excessive force as a matter of law."

(Appellee Br. 20-21.)  But in *Thacker*, the officers merely attempted to handcuff the plaintiff, and in the process pulled him in different directions, causing all three to fall to the ground. 182 F. App'x at 467.  The court concluded that attempting to handcuff Thacker was reasonable, and was not rendered unreasonable simply because it caused the officers and Thacker to fall.  *Id.* at 472.  The court thus did not hold that it was reasonable for the officers to *purposefully* wrestle the plaintiff to the ground, as Price did here.

Ultimately, Price's contention that his actions were objectively reasonable views the facts in the light most favorable to Price, not to Laury.  Because a jury could conclude that a reasonable officer would not have viewed Laury's statements and actions as threatening, Price is not entitled to qualified immunity for the takedown.

### b.  Actions on the Ground

Price's actions following the initial takedown are similarly not entitled to qualified immunity.  The video shows Price using his body weight and knee to hold Laury down on the ground despite the fact that Laury does not appear to be struggling.  In prior cases, we have held that it is unreasonable for an officer to continue to put pressure on an arrestee's back once he is already subdued.  *See Ortiz ex rel Ortiz v. Kazimer*, 811 F.3d 848, 852 (6th Cir. 2016) ("[A]n officer uses excessive force when he presses face-down a non-resisting and surrendered suspect longer than needed."); *Bolick v. City of E. Grand Rapids*, 580 F. App'x 314, 315, 320 (6th Cir. 2014) (affirming denial of qualified immunity where, once suspect was already on his stomach in handcuffs, one officer tased him and another "applied pressure to [his] back with both of his knees").  And even if it were reasonable for Price to use his body weight to keep Laury down until he was handcuffed, the video shows Price kneeling on Laury's back *after* Laury was handcuffed and was not resisting.  (*See* Booking Video NE, 10:57:00-10:57:40.)

Next, Laury contends it was excessive for Price to "manipulate and press down on" Laury's head and neck while he was on the ground. (Laury Br. 27.) In *Morrison v. Board of Trustees of Green Township*, 583 F.3d 394 (6th Cir. 2009), this court denied summary judgment to an officer who, while at the plaintiff's home attempting to take her for a psychiatric evaluation, tackled the plaintiff and allegedly "pushed her face into the ground every time she tried to talk" while she was lying on the ground, on her stomach, handcuffed and not resisting. *Id.* at 397-98. The court noted, "[s]uch antagonizing and humiliating conduct is unreasonable under the Fourth Amendment, . . . and crosses the line into physical abuse of an incapacitated suspect." *Id.* at 407 (citations and internal quotation marks omitted). Similarly, a reasonable factfinder could conclude that it was unreasonable for Price to continue to put pressure on Laury's head and neck when Laury was already restrained on the ground and not struggling or resisting.

Appellees contend it was objectively reasonable for Price to restrain Laury with his body weight because it is undisputed that Laury continued to struggle. However, the video does not show Laury struggling.[5] Thus, although Price may have had a reason to re-handcuff Laury, a reasonable factfinder could conclude that continuing to exert pressure on Laury's head and neck once Laury was on the ground, and putting his body weight on Laury's back and pulling out his earring after he was handcuffed, was "unwarranted and unreasonably severe." *See Baker*, 471 F.3d at 607 (finding it not objectively reasonable where officer, after finding suspect who had run from him, allegedly hit suspect in the head and knee with baton after suspect had surrendered).

---

[5] Appellees' contentions at argument that Laury admitted on deposition to refusing to cooperate while he was on the ground, and that he could not be re-handcuffed until Rodriguez arrived to assist, are unsupported by the record.

### 2. Rodriguez

Laury contends that Rodriguez violated his right to be free from excessive force by pressing down on Laury's head with his knee while Laury was on the ground and subdued.

Appellees first argue that Rodriguez is entitled to summary judgment because Laury failed to differentiate the actions of any officer other than Price. In § 1983 cases, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). "[M]ere presence at the scene . . . , without a showing of direct responsibility for the action, will not subject an officer to liability." *Id.* (quoting *Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984)).

In his district court briefing, Laury clearly identified that a second officer—not officer Price—put his foot on Laury's head. (PID 341.) Similarly, Laury argued that while Price used excessive force against him, another officer participated in the "attack." (PID 357.) Laury contended he could not identify the particular officer. (Laury Dep., PID 147; *see also* PID 342.) However, as the district court noted, Rodriguez's own deposition testimony and the Booking Video permit the inference that it was Rodriguez who participated in the "attack." Thus, Laury *did* differentiate the actions of another officer who participated in the alleged excessive force, even if he did not specifically name the officer. *Cf. Binay*, 601 F.3d at 651 (finding a disputed issue of fact regarding whether an officer participated in attack on the plaintiff where the officer admitted to facts permitting the inference that he participated, and "the fact that Defendants wore masks during the raid made it exceedingly difficult for Plaintiffs to identify . . . which officers engaged in which conduct"); *Pershell v. Cook*, 430 F. App'x 410, 416 (6th Cir. 2011) (concluding that although the plaintiff could not see the officers who engaged in excessive force,

the record contained sufficient information from which the jury could "determine the liability of each individual defendant for the alleged constitutional violation").[6]

Appellees argue in the alternative that Rodriguez is entitled to summary judgment on the merits of the claim, because he "merely helped to restrain Laury by kneeling on or next to his upper back so that he could be re-handcuffed." (Appellees' Br. 22.) However, this views the facts in the light most favorable to Rodriguez, not to Laury. As discussed, the video does not show Laury struggling. Nor does the record support Appellees' contention that it is undisputed that Laury struggled. Laury testified at his deposition that he did not struggle or resist during his altercation with Price and "another officer." (Laury Dep., PID 149.)

Relying on *Bozung v. Rawson*, 439 F. App'x 513 (6th Cir. 2011), Appellees argue Rodriguez's actions were reasonable as a matter of law.[7] In *Bozung*, however, the court concluded that although the parties' accounts differed, there was no genuine issue of material fact regarding the use of excessive force. *Id.* at 520. Even viewing the facts in the light most favorable to the plaintiff, the officer's use of a straight-arm bar takedown to neutralize and handcuff the plaintiff when he failed to comply with the officer's instructions was objectively reasonable because the officer had just stopped a car in which the plaintiff was a passenger, and thus had very little information about the plaintiff other than he appeared intoxicated, the driver of the vehicle had run, and the plaintiff had a warrant out for his arrest. 439 F. App'x at 520. Here, however, there are genuine disputes of fact whether a reasonable officer in Rodriguez's

---

[6] For the same reasons, we reject Appellees' argument that Laury did not preserve for appeal arguments differentiating Rodriguez's actions.

[7] Appellees also rely on *Crace v. Efaw*, No. 09-CV-551, 2012 WL 3962799 (S.D. Ohio Sept. 10, 2012). However, *Crace* is inapposite; that decision was an order following a bench trial where the court made findings of fact on relevant issues, which this court may not do on summary judgment. 2012 WL 3962799, at *1.

position would have believed kneeling on Laury's head was necessary under the circumstances. Although Rodriguez contends Laury was struggling, the video does not support that contention, nor is Laury's account blatantly contradicted by the video.

Viewing the facts in the light most favorable to Laury, Rodriguez put pressure on Laury's head with his knee when Laury was already subdued and being held down by Price; thus, a factfinder could conclude his use of force was gratuitous and unreasonable. *See Morrison*, 583 F.3d at 408 ("[T]he law is clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized."). Thus, Rodriguez is not entitled to qualified immunity.

### 3. Officer Campbell

Laury argues that Officer Campbell is liable for failing to intervene in Price's use of force. Although an officer's "mere presence during the altercation, without a showing of some direct responsibility, cannot suffice to subject [him] to liability," an officer present may be liable where he either supervised the offending officer or owed the plaintiff a duty of protection. *Burgess*, 735 F.3d at 475. To prevail on a claim that an officer owed the plaintiff a duty of protection, the plaintiff must show that the defendant "'observed or had reason to know that excessive force would be or was being used' *and* 'had both the opportunity and the means to prevent the harm from occurring.'" *Id.* (emphasis in original) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

The district court granted summary judgment to the defendants on Laury's failure-to-intervene claim because Laury failed to make any substantive arguments or to "differentiate the conduct of any defendant officer," stating only that he was not sure who participated in the attack and who merely observed. (Dist. Ct. Op., PID 478-79.) Appellees urge this court to find the

same.  However, although Laury did not specifically name the officers who observed the "attack" in his summary judgment briefing, he contended that the record established that officers other than Price were present during Price's use of excessive force, but did not act to prevent it. (PID 357-58.)  Thus, this argument was properly before the district court.

Appellees also argue Laury has not articulated a failure-to-intervene claim because 1) Laury does not argue that Officer Campbell had an opportunity to intervene, only that he stood by, and 2) the video shows that Officer Campbell was dealing with Devonte at this time and therefore was not in a position to intervene.

Appellees' second argument is belied by the Booking Room Video.  The video shows that Officer Campbell was not in the room when Price initiated the takedown, and when he arrived, he immediately walked toward Devonte.  (Booking Videos NE, NW at 10:55:24-10:56:21.)  However, Officer Campbell then walked over to Laury and Price while Price was leaning on Laury's back with his knee and allegedly pressing down on Laury's head, and stood there for at least a minute until the two put Laury in the restraint chair.  (Booking Video NE, 10:56:21-10:57:53.)  For some of this time, Devonte was not even in the room, having been dragged out by Rodriguez.  (*See* Booking Video NE, 10:56:39-10:57:41; *see also* S. Campbell Dep., PID 263.)

Further, that Officer Campbell stood by while some of the alleged excessive force occurred, and appeared to look directly at Laury and Price, suggests he had "the opportunity and the means to prevent the harm from occurring."  *Kent v. Oakland Cty.*, 810 F.3d 384, 397 (6th Cir. 2016) (concluding that officer had means and opportunity to intervene where she was in the room for most of the incident, "communicated with [the other officer] as the events unfolded, . . . was facing [the plaintiff] when she heard [the officer] warn [the plaintiff] that he would use the

taser[, and] . . . was close enough to handcuff [the plaintiff] immediately after the taser was deployed"); *Goodwin v. City of Painesville*, 781 F.3d 314, 328–29 (6th Cir. 2015) (finding a jury question whether a reasonable officer in the defendants' position would have seen the use of force being applied and taken action to stop it where officers were present for at least part of the incident). Thus, the district court erred in granting summary judgment to Officer Campbell on Laury's failure-to-intervene claim.

## B. Restraint Chair and Tight Handcuffing

Laury argues that his Fourth Amendment rights were violated by Price when he ignored Laury's complaints about his handcuffs being too tight, and by Officers Price, Rodriguez, and Campbell when they placed him in a restraint chair for several hours and when they refused to loosen the hand restraints on the restraint chair.

The district court properly granted summary judgment to Defendants on Laury's tight-handcuffing claim because Laury failed to plead it in the complaint and did not attempt to amend the complaint after his deposition, where he first mentioned that his handcuffs were too tight. (Dist. Ct. Op., PID 479-80.) At argument before this court, Laury's counsel conceded this was not pleaded as a separate claim, but contended it was in the complaint and thus asked the court to consider it. Oral Arg. at 9:11-9:30. However, the complaint mentions handcuffs only to state that the officers placed Laury in handcuffs upon his arrest. (Compl., PID 4.) Thus, the district court properly concluded this claim was waived. *See Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788–89 (6th Cir. 2005).

Further, Laury's counsel conceded at argument that this claim—that the officers violated his Fourth Amendment rights by placing him in a restraint chair even though he was already subdued—was not in the pleadings. Oral Arg. at 10:44-10:53. Thus, we also affirm the district

court's grant of summary judgment on this claim. Finally, although Laury makes a separate argument on appeal that the restraints on the chair were excessively tight, he did not make that argument before the district court. Thus, Laury did not preserve this claim for appeal. *See DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006) ("In general, this court will not review issues raised for the first time on appeal.").

### C.  Officer Huffman

Although Laury named Huffman in the complaint, he does not allege any excessive force on the part of Huffman, and conceded he did not see Huffman again after Huffman left the elevator. Thus, we affirm the district court's grant of summary judgment to Huffman.

### IV.

For the foregoing reasons, we **AFFIRM in part**, **REVERSE in part,** and **REMAND** for further proceedings consistent with this opinion.[8]

---

[8] To overcome the officers' assertion of qualified immunity, Laury must show that there was a constitutional violation *and* that the right at issue was clearly established. *Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012). In reversing the district court's determination that Laury failed to show a constitutional violation, we do not address whether the right at issue was clearly established, as the issue is not addressed by the parties and was not addressed by the district court.