NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0295n.06

Nos. 21-1391/1402

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 20, 2022
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| LARRY SEVENSKI, | ) |
| Plaintiff-Appellee/Cross-Appellant, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| BROCK ARTFITCH, | ) COURT FOR THE WESTERN |
| | ) DISTRICT OF MICHIGAN |
| Defendant-Appellant/Cross-Appellee. | ) |
| | ) OPINION |
| | ) |

Before: SUHRHEINRICH, WHITE, and STRANCH, Circuit Judges.

STRANCH, J., delivered the opinion of the court in which WHITE, J., joined. SUHRHEINRICH, J. (pp.14–33), delivered a separate opinion concurring in part and dissenting in part.

JANE B. STRANCH, Circuit Judge. In this civil rights action, Michigan state trooper Brock Artfitch appeals the district court's denial of his motion for summary judgment based on qualified immunity. Larry Sevenski cross-appeals the district court's denial of his motion for default judgment or an adverse inference jury instruction against Artfitch for spoliation of evidence. For the reasons stated below, we **AFFIRM** the district court's decision denying Artfitch summary judgment, and we **DISMISS** Sevenski's cross-appeal for lack of jurisdiction.

## I. BACKGROUND

### A. Factual Background

The following facts are taken in the light most favorable to Sevenski. Sevenski owns a bar and grill in Elmira, Michigan where he organized an event for St. Patrick's Day in 2017. During

the event, customers informed him that police were stopping people near his establishment. Sevenski left the event in his vehicle intending to speak with police about the situation. Two Michigan state troopers, Artfitch and his partner, Jacob Hubbard, were on patrol that night and initiated a traffic stop of Sevenski for allegedly failing to use a turn signal—an allegation that Sevenski denies. Sevenski was 83 years old, weighed approximately 150–160 pounds, and was 5 feet 6 inches tall. He got out of his car and walked toward the patrol car to talk to Artfitch and Hubbard, raising his hands above his shoulders with his palms open to block the patrol car's flashing lights from his eyes. Trooper Artfitch exited his patrol car and approached Sevenski. Artfitch testified that he ordered Sevenski to get back into his car and that Sevenski refused to comply. Sevenski testified that he did not hear any such command.[1] Artfitch asked Sevenski if he had any weapons. Sevenski answered truthfully that he did not have any weapons, adding that he wished he did, and telling the troopers that he had a bone to pick with them.

Sevenski states that without warning and without announcing that he was under arrest, Artfitch grabbed one of his hands and "threw him to the ground," in what is referred to as an arm-bar takedown, knocking him unconscious and badly injuring him. Sevenski's injuries from Artfitch's use of force included a broken nose, a broken arm, fractured ribs, and a dislocated elbow. Emergency responders took Sevenski to the hospital where he was treated, and underwent surgery on his arm and elbow.

At the time, Artfitch's patrol car was equipped with an audio/video recording system that makes both a primary recording at the triggering of an event and a backup from a continuous recording. The primary recording of the event was found to show only seventeen seconds of video,

---

[1] Sevenski was later charged with assaulting, resisting, obstructing, opposing, or endangering a police officer under Michigan Compiled Law (MCL) § 750.81d. A jury convicted Sevenski "solely on the fact that he failed to follow orders to return to his vehicle" and a fine was levied against him.

all of which occurred after the altercation. Evidence of a backup recording exists but that video was recorded over because Artfitch allegedly failed to follow department policy and take his patrol car out of service upon discovering that the primary recording had malfunctioned. Based on these facts, Sevenski argues Artfitch spoiled evidence such that Sevenski is entitled to default judgment or an adverse inference jury instruction.

### B. Procedural History

Sevenski filed this action under 42 U.S.C. § 1983, bringing one count of excessive force in violation of the Fourth Amendment against Trooper Artfitch. Following discovery, Artfitch moved for summary judgment, arguing that he is entitled to qualified immunity. Sevenski also moved for default judgment or an adverse inference jury instruction against Artfitch for spoliation of the evidence.

The district court denied Artfitch's motion for summary judgment, finding that genuine issues of material fact existed, and a reasonable jury could find he violated Sevenski's clearly established constitutional rights. As for Sevenski's motion regarding spoliation of the evidence, the district court denied the motion for default judgment but reserved judgment on the adverse inference jury instruction for trial. Artfitch appeals the denial of summary judgment based on qualified immunity and Sevenski cross-appeals the denial of default judgment.

## II. JURISDICTION

A district court's denial of summary judgment is not normally a proper subject of interlocutory appeal, but orders denying qualified immunity are immediately appealable under the collateral-order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 525–27 (1985); *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir.2008). Our jurisdiction over qualified immunity appeals is narrow: "This Court may exercise jurisdiction 'only to the extent that a summary judgment order denies qualified

immunity based on a pure issue of law.'" *Harrison*, 539 F.3d at 517 (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir.2006)). The defendant must accept all facts in the light most favorable to the plaintiff, and to the extent that the denial of qualified immunity is based on a factual dispute, such a denial falls outside the narrow jurisdiction of this Court. *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir.1998). In the present case, Artfitch states that he concedes Sevenski's version of the facts. We therefore have jurisdiction over Artfitch's appeal. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 277 (6th Cir. 2020).

Sevenski cross appeals from the denial of default judgment against Artfitch as a sanction for spoliation of evidence. Artfitch argues that we do not have jurisdiction to hear Sevenski's cross appeal because it is not from a final appealable order under 28 U.S.C. § 1291. Sevenski does not contest that the denial of default judgment in this case is not a final appealable order. Instead, he argues appellate jurisdiction exists because interlocutory appeals from the denial of qualified immunity are treated as "final decision[s]" by appellate courts. And, Sevenski argues, appeals from final decisions generally raise all prior orders for appellate review.

Sevenski's argument, however, misunderstands the collateral order doctrine. An interlocutory appeal made pursuant to the collateral order doctrine does not permit appellate review of all prior orders in a case. Rather, "[w]here, as here, 'a federal appellate court reviews a district court decision on an interlocutory basis, it may not at the same time review unrelated questions that are not themselves entitled to expedited consideration.'" *Ross v. Am. Exp. Co.*, 547 F.3d 137, 142 (2d Cir. 2008) (quoting *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 122 (2d Cir. 2007)). Finding otherwise would permit parties to turn review of "collateral orders into multi-issue interlocutory appeal tickets" of the type expressly prohibited by the Supreme Court in *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 50 (1995).

Nor can we review Sevenski's cross appeal through the use of pendent appellate jurisdiction. "The doctrine of pendent appellate jurisdiction allows an appellate court, in its discretion, to exercise jurisdiction over issues that are not independently appealable when those issues are 'inextricably intertwined' with matters over which the appellate court properly and independently has jurisdiction." *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998) (citing *Swint*, 514 U.S. at 49-50). A claim satisfies the "inextricably intertwined" requirement "only if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal—that is, when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well." *Mattox v. City of Forest Park*, 183 F.3d 515, 524 (6th Cir. 1999) (quoting *Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995)). In the present case, Sevenski's cross appeal regarding spoliation of the evidence does not present an issue that is "inextricably intertwined" with the denial of summary judgment to Artfitch. Accordingly, we dismiss Sevenski's cross appeal for lack of jurisdiction.

## III.  STANDARD OF REVIEW

"We review the denial of summary judgment on the basis of qualified immunity de novo[,]" *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013), "construing the evidence and drawing all reasonable inferences in favor of the non-moving party[,]" *Ky. Com. Mobile Radio Serv. Emergency Telecomms. Bd. v. TracFone Wireless, Inc.*, 712 F.3d 905, 912 (6th Cir. 2013). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010). "After the moving party has met its burden, the burden shifts to the nonmoving party, who must present some 'specific

facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## IV.   ANALYSIS

"The court follows a 'two-tiered inquiry to determine whether a defendant is entitled to qualified immunity.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012)). "To satisfy the first prong at the summary-judgment stage, the plaintiff must show that 'based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred.'" *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015) (quoting *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005)). To satisfy the second prong, the plaintiff must show that "the violation involved a clearly established constitutional right of which a reasonable person would have known." *Id.* (quoting *Sample*, 409 F.3d at 696). Courts may address the two prongs in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We examine each in turn.

### A.  Constitutional Violation: Excessive Force

The Fourth Amendment's protection against unreasonable seizures prohibits law enforcement officers from using excessive force against someone "in the course of an arrest, investigatory stop, or other 'seizure[.]'" *Graham v. Connor*, 490 U.S. 386, 395 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without

regard to their underlying intent or motivation." *Id.* at 397. "The test is 'reasonableness at the moment' of the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Griffith v. Coburn*, 473 F.3d 650, 656 (6th Cir. 2007) (quoting *Graham*, 490 U.S. at 396).

"Three important but non-exhaustive factors guide [the excessive force] analysis: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Goodwin*, 781 F.3d at 321 (quoting *Shreve v. Jessamine Cty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2006)) (listing what are known as the *Graham* factors). "The ultimate question, however, is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Kent v. Oakland Cty.*, 810 F.3d 384, 390 (6th Cir. 2016) (quoting *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005)).

In our review of the totality of the circumstances, we begin by applying the *Graham* factors. First, the alleged crime that instigated the traffic stop was Sevenski's failure to use a turn signal, which Sevenski denies. Even if Sevenski did fail to use his turn signal, the infraction is exceedingly minor. The second *Graham* factor, whether Sevenski posed an immediate threat to Artfitch or Hubbard, presents a closer question. Sevenski exited his car and walked towards the officers' vehicle. Artfitch testified that he told Sevenski to stop advancing and return to his car. Sevenski testified that he did not hear any such command.[2] The record indicates that Sevenski was walking toward the officers in a normal, nonaggressive manner, and that both hands were visible to Artfitch because Sevenski had raised his hands with the palms out to shield his eyes from

---

[2] We assume for purposes of our analysis that Artfitch believed he was dealing with a person who was disobeying orders. Thus, whether Sevenski heard the command is not material to our decision.

the flashing police lights. The record also reflects that Artfitch knew Sevenski from a previous encounter, so Artfitch knew that Sevenski was elderly, and that he was not a large man, both of which reduce the risk that Sevenski posed an immediate threat to the younger and bigger officer. On this record, a reasonable factfinder, taking into consideration the totality of the circumstances, could find Sevenski did not pose a threat to the officers. Artfitch argues that Sevenski's response to him that Sevenski was not armed but he "wished he was," and Sevenski's statement that he had a bone to pick with the troopers amounted to a "veiled threat." Artfitch Br. at 25-26. However, "[a] reasonable factfinder could view these actions as 'argumentative at worst,' rather than threatening." *Laury v. Rodriguez*, 659 F. App'x 837, 843 (6th Cir. 2016) (internal quotations marks omitted).

Finally, Sevenski was not resisting or attempting to evade arrest, or attempting to flee. In fact, it is undisputed both that he was never told that he was under arrest prior to Artfitch's use of force, and that he was never warned that force would be used against him if he did not return to his car. Even if Artfitch believed Sevenski was disobeying his orders by continuing to walk toward the officers instead of returning to his car, noncompliance is not the same as active resistance when assessing whether the use of force was reasonable, and, if so, to what extent. *See, e.g.*, *Goodwin*, 781 F.3d at 323-24; *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) ("If there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more."). Active resistance requires not only a refusal to comply with orders, but also "some outward manifestation" that suggests intentional disobedience or blatant resistance. *Kent*, 810 F.3d at 392.

Artfitch concedes Sevenski's facts for this appeal, as he must, but a jury would likely be confronted with the parties' differing interpretations of the same material facts.[3] A jury's determination of whether Sevenski's conduct was confrontational and aggressive, or merely passive and unthreatening, will inform the jury's view as to whether the threat posed to Artfitch justified the forceful takedown of Sevenski and was objectively reasonable under the totality of the circumstances. The dissent insists that Sevenski's conduct unequivocally constitutes "resisting arrest," but, as the cases cited above make clear, noncompliance is not the same as "active resistance." A reasonable jury could conclude on this record that Sevenski's conduct did not warrant the forceful arm-bar takedown employed by Artfitch. The dissent's accusation that we are applying 20/20 hindsight and improper inferences could apply equally to the dissent's portrayal of the facts. It is simply not certain that a reasonable officer, confronted with the same situation, "*would* view Sevenski's statements as much more than argumentative." Dissent at 18 (emphasis added). "[J]ust because we must look at the circumstances through the eyes of a reasonable officer does not mean … that we must accept the officers' subjective view of the facts." *Jacobs v. Alam*, 915 F.3d 1028, 1041 (6th Cir. 2019). Accordingly, qualified immunity is inappropriate.

---

[3] While conceding that "we must view the facts in Sevenski's favor," the dissent contends that the majority "ignore[s] the undisputed record evidence that already favors Artfitch" and in "form[ing] its conclusion by drawing inferences favorable to Sevenski, it fails to show how those inferences are supportable by the record." Dissent at 19. But here the two versions of events differ substantially from each other, which requires courts "to *view the facts and draw reasonable inferences* 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 377 (2007) (emphasis added) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). And "the defendant must be prepared to overlook any factual dispute and to concede an *interpretation* of the facts in the light most favorable to the plaintiff's case." *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir.1998) (emphasis added). Thus, a jury could interpret the largely undisputed facts as either suggesting that Sevenski was dangerous, and therefore Artfitch's response was justified, or a jury could interpret those same facts as suggesting that Sevenski was not a danger to Artfitch. That is the ultimate determination and is to be made by the jury. Despite the dissent's multiple arguments that a jury could find for Artfitch, the governing standard for summary judgment requires us to view the facts and inferences in favor of Sevenski.

Our recent opinion in *LaPlante v. City of Battle Creek*, 30 F.4th 572 (6th Cir. 2022), is instructive. In *LaPlante*, the officers were confronted with an intoxicated driver who refused to follow orders to show his hands, put down his beer, and put his hands behind his back. The driver later pleaded guilty to a felony charge of operating a vehicle under the influence of alcohol and a high misdemeanor charge of attempted obstruction of a police officer. The officer claimed that the driver's movements made him "worry that [p]laintiff might flee or possibly injure him." *Id*. at 580 n.10. We held that a reasonable jury could determine that plaintiff's failure to promptly obey all of the officer's orders was "not necessarily . . . active resistance" and did not place the officer "in such a dangerous situation that a forceful takedown maneuver was reasonable." *Id*. at 580.

Likewise, a reasonable jury in this case could find Artfitch's use of force, or the amount of force used, objectively unreasonable. Artfitch was confronted with an elderly man, whom he knew, who disobeyed a command to return to his car after a minor traffic violation, and who approached the officers with both hands raised in the air, but was not actively resisting arrest or attempting to flee. In response, Artfitch used force that caused Sevenski to lose consciousness, broke his nose and arm, dislocated his elbow, and fractured his ribs. The ultimate question, as always, is whether the totality of the circumstances justified the use of an arm-bar takedown. *See, e.g., McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013); *Pershell v. Cook*, 430 F. App'x 410, 415-16 (6th Cir. 2011); *Lawler v. City of Taylor*, 268 F. App'x 384, 386-87 (6th Cir. 2008); *accord Mattos v. Agarno*, 661 F.3d 433, 441 (9th Cir. 2011). On this record, a jury could reasonably determine that the significant use of force against Sevenski was more than was necessary for Artfitch to take control of the situation. *Martin v. City of Broadview Heights*, 712 F.3d 951, 958

(6th Cir. 2013) (clarifying that the inquiry is not whether any force was justified, but whether the officer "could reasonably use the *degree* of force" that was employed). [4]

## B. Clearly Established

"A right is clearly established if '[t]he contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Goodwin*, 781 F.3d at 325 (quoting *Wheeler v. City of Lansing*, 660 F.3d 921, 938 (6th Cir. 2011)). "The court 'need not, of course, find a case in which the very action in question has previously been held unlawful, but in the light of pre-existing law, the unlawfulness must be apparent.'" *Brown*, 779 F.3d at 412 (quoting *Comstock v. McCrary*, 273 F.3d 693, 711 (6th Cir. 2001)). That is, "[t]he dispositive question is 'whether the defendants had fair warning that their actions were unconstitutional.'" *Griffith*, 473 F.3d at 659 (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005)). Here, the issue is whether Artfitch's specific action in taking Sevenski to the ground with such force to cause injury constitutes excessive force in light of clearly established law at the time of the March 2017 incident.

In *McCaig v. Raber*, law enforcement responded to reports of an altercation outside a bar in Michigan in January 2008. 515 F. App'x 551 at 553. As officers approached, they saw plaintiff

---

[4] The dissent relies on Sevenski's conviction under Michigan Compiled Laws § 750.81 to conclude that Artfitch did not use excessive force. Dissent at 20-21. The Michigan statute provides, in pertinent part, that "an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony." Because the definition of "obstruct" under the statute includes failing to follow a lawful command, the conviction reasonably could be construed to have been based only on a failure to comply with a "lawful command." Such a failure, absent physical resistance to a law enforcement official, would not necessarily justify a use of force by an arresting officer. While the dissent argues that the jury convicted Sevenski because he "resisted" the officers, the verdict was "general" and we do not know which part of the statute the jury relied on to convict Sevenski. The dissent's view that *Heck v. Humphrey*, 512 U.S. 477 (1994), forecloses any argument by Sevenski that he did not engage in actions justifying the use of force against him is also unavailing. We have held that "[t]he *Heck* doctrine applies only where a § 1983 claim would 'necessarily' imply the invalidity of a conviction." *Schreiber v. Moe*, 596 F.3d 323, 335 (6th Cir. 2010) (citation omitted). That is not the case here, where the jury could have validly convicted Sevenski under the Michigan statute for failing to follow a lawful command. Such a conviction does not preclude a finding of excessive force in a civil case under § 1983. *See Ruemenapp v. Oscoda Twp., MI*, 739 F. App'x 804, 809-10 (6th Cir. 2018).

strike another individual in the face. After being informed that he was under arrest, plaintiff put his hands up in the air and held his hands out for handcuffing. The officer then placed a handcuff on plaintiff's left hand and held his right hand. The officer instructed plaintiff to place his right hand behind his back, but plaintiff could not because the officer was holding his arm. The officer then screamed at the arrestee to place his hand behind his back so loudly that it hurt plaintiff's ear and caused him to "jerk[] away." *Id*. The officer then executed a takedown maneuver that resulted in a broken wrist. The officer testified that plaintiff was trying to pull away from him, and that justified the use of force. The district court denied qualified immunity because there were issues of material fact regarding whether the plaintiff's actions constituted resistance. We affirmed, reasoning that because plaintiff was unarmed and offered no resistance, a reasonable jury could find that law enforcement used excessive force. *Id*. at 555. Because our court has repeatedly held that the use of force on a suspect who poses no serious threat to law enforcement can be excessive, we determined that the law was clearly established. *Id*. at 555–56 (collecting cases); *see also LaPlante*, 30 F.4th at 583 (concluding that, in May 2016, the plaintiff had a clearly established right to be free from takedown maneuvers employed with excessive force); *Aldrich v. City of Columbus*, No. 2:15-cv-404, 2016 WL 6084570, *7 (S.D. Ohio Oct. 18, 2016) ("[T]he use of a takedown on an unrestrained, non-fleeing, non-violent suspect has been held, in materially similar circumstances, to be objectively unreasonable.") (citing *McCaig*, 515 F. App'x at 553)).

The circumstances here are similar to both *McCaig* and *LaPlante*. A direct refusal to follow an officer's commands did not preclude a finding that a takedown was excessive. "It was well-established at the time of the incident in this case that a non-violent, non-resisting, or only passively resisting suspect who is not under arrest has a right to be free from an officer's use of force." *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017) (per curiam). Even if Sevenski was under arrest,

"cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Baker*, 471 F.3d at 608 (quoting *Shreve*, 453 F.3d at 688). Accordingly, under the facts viewed in the most favorable light to Sevenski, an objectively reasonable officer would have been on notice that throwing Sevenski to the ground with enough force to cause the significant injuries he suffered constitutes excessive force.

## V. CONCLUSION

For the forgoing reasons we **AFFIRM** the district court's decision denying Artfitch summary judgment based on qualified immunity and **DISMISS** Sevenski's cross appeal for lack of jurisdiction.

SUHRHEINRICH, Circuit Judge, concurring in part and dissenting in part. The question here is whether an objectively reasonable officer standing in Trooper Artfitch's shoes would have been justified in using a modest level of physical force to gain control of the situation. It's a pure question of law, not of fact. *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) ("The Supreme Court . . . [has] reject[ed] the argument that the question of objective reasonableness is 'a question of fact best reserved for a jury.'" (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007))). Although we must view the facts in Sevenski's favor, and draw reasonable inferences in his favor, those inferences still must be "supportable by the record." *Scott*, 550 U.S. at 381 n.8 (emphasis omitted). And employing hindsight in these cases has been verboten for over thirty years. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

Yet the majority, wielding little more than hindsight bias and a smattering of factual inferences not supported by the record, strips Artfitch of qualified immunity. I respectfully dissent. When faced with an unrestrained, disobedient, and aggressive (both verbally and physically) driver during a traffic stop, any reasonable officer would have been justified in using Artfitch's arm-bar takedown—a maneuver that we have repeatedly blessed. *See, e.g.*, *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007); *Bozung v. Rawson*, 439 F. App'x 513, 520–21 (6th Cir. 2011); *Ryan v. Hazel Park*, 279 F. App'x 335, 337 (6th Cir. 2008).

The whole point of qualified immunity is to give officials "breathing room to make reasonable but mistaken judgments." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). We're the legal experts, after all, not them. Artfitch made no mistake here, but the majority's holding otherwise should put a giant question mark in the head of every police officer conducting a traffic stop—a situation that is, even without that uncertainty, already "especially fraught with danger to

police officers." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)).

### A.     No Constitutional Violation Occurred

*1. Threat to officer safety.*   Any reasonable officer would have concluded that Sevenski posed a safety threat requiring a response.  Artfitch was faced with the following undisputed facts: it was a Friday night on St. Patrick's Day—a night when any officer can reasonably expect to encounter predictably unpredictable drunken drivers.  The officers pulled over (*i.e.*, seized) Sevenski for a traffic violation on a dark rural road in northern Michigan.  Sevenski responded by immediately exiting his vehicle without being asked to, then approaching the officers.  While approaching the officers, Sevenski said that he had a "bone to pick" with them and that he "wish[ed]" he was armed.  He continued to approach the officers, despite their repeated orders to stop and return to his vehicle.

When Sevenski was within arm's reach of the officers, Artfitch grabbed one of his hands. According to Artfitch, Sevenski then "squeezed" that hand, "cocked [the other] hand back, balled that hand into a fist," and "tens[ed] up" his body, while "looking directly at [Artfitch's] face," as if he was about to punch Artfitch. Although Sevenski doesn't "remember" making a fist, he remembers that he "tensed up and [he] grabbed [Artfitch] back."  Artfitch then took Sevenski to the ground with an arm-bar takedown.  Under these circumstances, Sevenski posed enough of a safety threat to justify Artfitch's modest level of force.  And given that all of this happened within seconds—likely in less time than it takes to read that summary—it's not even a close case, in my view.

Due to the inherently dangerous nature of traffic stops, *see, e.g.*, *Johnson*, 555 U.S. at 330, police officers must "exercise unquestioned command of the[se] situation[s]" to prevent "[t]he risk

of harm to both" themselves and the seized suspect, *Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (quoting *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981)).  The officers here tried to do just that—first without using *any* physical force—by ordering Sevenski to return to his vehicle.

That did not work; Sevenski continued to approach them.  Only then, when Sevenski was within arm's length, refusing to comply with their commands, and providing physical resistance, did Artfitch take Sevenski to the ground.  *Graham* recognized that police have "the right to use some degree of physical coercion or threat thereof to effect" an arrest or investigatory stop, *Graham*, 490 U.S. at 396, and that's all the takedown did here, *see, e.g.*, *Fox*, 489 F.3d at 237 (affirming the grant of qualified immunity to an officer who used an arm-bar takedown to effect an arrest); *Earnest v. Genesee County*, 841 F. App'x 957, 960–61 (6th Cir. 2021) (same); *Bozung*, 439 F. App'x at 520–21 (same); *Vester v. Hallock*, 864 F.3d 884, 887 (8th Cir. 2017) (same). Artfitch's actions were objectively reasonable given the safety threat that Sevenski posed.

To reach the opposite conclusion, the majority supplies factual inferences using 20/20 hindsight—a no-no since *Graham*, 490 U.S. at 396.  First, the majority says that its reading of "[t]he record indicates that Sevenski was walking toward the officers in a normal, nonaggressive manner." Op. at 7.  As the undisputed facts above show, the record indicates no such thing.  Rather, any reasonable officer would conclude that it was *neither* normal *nor* nonaggressive to immediately exit a vehicle during a traffic stop, approach the officers, spout threatening statements, and continue to approach them after being ordered to stop.  The majority's conclusion that Artfitch had *no* objectively reasonable fear for his safety is inexplicable—especially since it

assumes that "Artfitch believed he was dealing with a person who was disobeying his orders." *Id.* at 7 n.2.[1]

Second, the majority decides that Sevenski's age and size "reduce[d] the risk that Sevenski posed" to the officers. *Id.* at 8. Even if that's so, he still posed *some* risk (as "reduce" implies), and officers are entitled to protect themselves "until the threat *has ended*." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (emphasis added). More importantly, elderly men—especially ones who run bars in rough-and-tumble northern Michigan—can conceal and wield a gun or knife regardless of their weight and size. And, based on Sevenski's other aggressive behavior, any reasonable officer would've been wise to think Sevenski posed such a risk. *See Zuress v. City of Newark*, 815 F. App'x 1, 5 (6th Cir. 2020) (noting "a reasonable officer would not have known that [the suspect was unarmed] at the time" as one fact justifying deploying a canine). Indeed, Sevenski's "previous encounter" with the officers, Op. at 8, to the extent it matters at all, gave Artfitch yet another reason to view him with caution.[2] Artfitch was thus allowed to use force to minimize whatever threat Sevenski posed. *See, e.g.*, *Zuress*, 815 F. App'x at 5; *Dunn*, 549 F.3d at 354 (affirming grant of qualified immunity to officers who forcibly removed suspect from car in part because they could not "have known what threat [the suspect] may have posed"); *Bozung*, 439 F. App'x at 520 (doing the same, noting "it was not clear to" the officer "whether [the suspect] posed an immediate threat to him").

---

[1] There's no reason to assume otherwise, at any rate, because Sevenski has never asserted that no order was *given*—he asserts only that he did not *hear* such order. He therefore has put forth no evidence genuinely disputing whether an order was given. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (stating that a factual dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

[2] In that prior encounter, Sevenski called police dispatch to ask for help collecting a debt; when Artfitch and his partner arrived and told Sevenski there was nothing they could do, Sevenski got "frustrat[ed]" and "unhappy" with them. Even according to Sevenski, he was "upset" and told them, "If you can't do no good you are just wasting my time" and ordered them to leave his property. Artfitch could have thought Sevenski had a short temper and may have harbored a personal grudge.

Moreover, the Constitution did not require the officers to let Sevenski land a fist first—or, worse, grab one of *their* weapons. *See Dunn*, 549 F.3d at 354; *Zuress*, 815 F. App'x at 5; *cf. Miller v. Taylor*, 877 F.2d 469, 471–72 (6th Cir. 1989) (recognizing officers' right to self-defense). Instead, we are supposed to defer "to the officer's on-the-spot judgment" as to the level of force necessary to eliminate a safety risk. *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396); *Plumhoff*, 572 U.S. at 777 (deferring to the officer's judgment as to the number of shots necessary to stop a threat). But the majority offers absolutely no deference to Artfitch here—it second-guesses his split-second decision to take Sevenski to the ground.

Third, the majority decides Sevenski's threatening statements—that he had a "bone to pick" with the officers and that he "wish[ed]" he was armed—are statements a jury could view as "'argumentative at worst,' rather than threatening." Op. at 8 (quoting *Laury v. Rodriguez*, 659 F. App'x 837, 844 (6th Cir. 2016)). But context matters, and *Laury*'s context is utterly inapplicable here.[3] Unlike Laury, who was already in custody and handcuffed, Sevenski was *unrestrained* (on the side of the road, not in a secure booking room)—and walking *toward* the officers despite their commands to stop—when he said the threatening comments. Any objectively reasonable officer, under *those* circumstances, would view Sevenski's statements as much more than argumentative.[4]

---

[3] In *Laury*, the plaintiff was *already* in police custody (in a booking room), and restrained with handcuffs, when he said to the officer, "Yeah, you a tough guy when I got these cuffs on." *Laury*, 659 F. App'x at 843. We said a jury could view that statement as "argumentative at worst" because the officer *removed* the handcuffs *after* the comment was made, which indicated that the officer did not feel so threatened. *Id.* Under those circumstances, of course a jury could find that no objectively reasonable officer would fear for his safety.

[4] The majority asserts that I too use hindsight bias and "accept the officers' subjective view of the facts." Op. at 9 (citation omitted). I do no such thing; instead, I conclude that any *objectively reasonable* officer (which is a question of law, not fact) would not dismiss Sevenski's statements as merely argumentative under the circumstances here—*i.e.*, when said by a disobedient driver during a tense traffic stop. To conclude otherwise, the majority plucks stray language from *Laury*—and applies that language far beyond what the case stands for—as if every word in the opinion is a binding statement of law. That is not how cases should be read. *See, e.g.*, *Brown v. Davenport*, __ U.S. __, 142 S. Ct. 1510, 1528 (2022) ("This Court has long stressed that 'the language of an opinion is not always to be parsed as though we were dealing with the language of a statute.'" (cleaned up)). But the majority's reliance on *Laury*, bereft of the case's context, does just that.

Based on those unsound premises, the majority reaches its officer-safety conclusion: that "a reasonable factfinder, taking into consideration the totality of the circumstances, could find Sevenski did not pose a threat to the officers." Op. at 8. But a factfinder could reach that conclusion only by ignoring (as the majority effectively ignores) key undisputed facts: namely, that Sevenski immediately exited his vehicle, said hostile statements to the officers, approached them, disobeyed their orders to stop approaching, then tensed up to take a swing at Artfitch.[5] I fail to see how anyone could reasonably conclude, when considering *all* those facts, that Sevenski posed *no* safety threat to the officers. True, we must view the facts in Sevenski's favor, but we may not *ignore* the undisputed record evidence that already favors Artfitch—as doing so necessarily fails to consider the facts in their totality. *See Scott*, 550 U.S. at 380–81; *Chappell v. City of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009). The majority, however, does just that.

Further, to the extent the majority forms its conclusion by drawing inferences favorable to Sevenski, it fails to show how those inferences are "*supportable by the record.*" *Scott*, 550 U.S. at 382 n.8; *see Chappell*, 585 F.3d at 912 (finding the district court erred by "rel[ying] on an inference drawn, not from the record evidence, but from a lack of evidence"). As one example, if the record supported an inference that Sevenski had "his hands straight up in the 'surrender' position," the majority's conclusion that he posed no safety threat to the officers might be proper. *See Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006). But all agree that Sevenski was not surrendering, and it is simply unreasonable to infer otherwise from the undisputed facts here.

---

[5] As Artfitch testified below, drivers "who have opened their doors and exited their cars immediately" during traffic stops, in his experience, do so "either to flee" or to "get[] into a physical confrontation with" the officers. Even Sevenski admits that he felt "threatened" by the officers' "hanging around" his bar, so he sought out to confront them about it.

In sum, even when viewing the facts in Sevenski's favor, any objectively reasonable officer would have viewed Sevenski as a safety threat. The majority's contrary conclusion is based only on hindsight bias, unsupported inferences, and inapplicable precedent.

*2. Seriousness of Sevenski's offense.* I take the majority's point that a traffic violation is a minor offense. Op. at 7. But, again, that's not the whole story here. What transpired *after* that traffic violation—Sevenski exiting his vehicle, approaching the officers while making threatening statements, ignoring the officers' orders to stop, and physically resisting Artfitch—constituted a felony under Michigan law, for which he was later convicted. *See* Mich. Comp. L. § 750.81d. That conduct escalated the situation dramatically, and the majority is wrong to consider only the impetus for the stop. *See Dunn*, 549 F.3d at 354 (noting that the cause for the initial traffic stop was an expired driver's license, but the ensuing car chase "cannot be dismissed as a minor traffic violation"); *Ryan*, 279 F. App'x at 338 (noting that the cause for the stop was a traffic violation, but the suspect "ultimately committed the felony offenses of fleeing and eluding and assaulting, resisting, or obstructing an officer"). Like Ryan and Dunn, Sevenski committed a felony—resisting an officer—by the time Artfitch took him to the ground.

The majority is also wrong to insert, as a purportedly undisputed fact, that "[a] jury convicted Sevenski 'solely on the fact that he failed to follow orders to return to his vehicle.'" Op. at 2 n.1. The source that the majority quotes for that proposition is the transcript of the summary-judgment hearing below, during which the district court summarized Sevenski's state-court conviction. But that transcript reflects only the *district court's understanding* of Sevenski's conviction—it says nothing about the state-court jury's actual bases for convicting Sevenski (after all, the district court did not preside over Sevenski's criminal trial). And, given that Sevenski admitted, when testifying in his own defense at that trial, that he "grabbed" Artfitch, the jury could

have convicted him of battering or endangering Artfitch under the same statute, not based merely on his failure to follow Artfitch's commands. *See* Mich. Comp. L. § 750.81d(1) (prohibiting, *inter alia*, "batter[ing]" and "endanger[ing]" an officer).

The crucial point is that Sevenski did not *just* commit a minor traffic offense. He also admitted to disobeying the officers and grabbing Artfitch—a felony for which a unanimous jury found him guilty beyond a reasonable doubt—prior to the takedown. That serious offense should not be written off as minor.[6]

*3. Sevenski's resistance.* Although Sevenski was not under arrest when he was approaching the officers, he was the subject of a traffic stop—a seizure under the Fourth Amendment—and thus was not free to leave or disobey the officers' orders.[7] *See Brendlin v. California*, 551 U.S. 249, 255–56 (2007). Further, because Sevenski was seized when he stopped his vehicle in

---

[6] It also seems to me that Sevenski's criminal conviction precludes his § 1983 suit under *Heck v. Humphrey*, 512 U.S. 477 (1994). The *Heck* doctrine bars any civil suit that "would necessarily imply the invalidity of the plaintiff's conviction or sentence." *Id.* at 487. For excessive-force cases, that can happen in two ways: (1) "when the criminal provision makes the lack of excessive force an element of the crime," or (2) "when excessive force is an affirmative defense to the crime." *Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010); *see also Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 610–11 (6th Cir. 2014).

Both scenarios apply here. First, a conviction under Mich. Comp. L. § 750.81d requires a lawful arrest (*i.e.*, one not effected through excessive force) as an element—as the state court properly instructed the jury in Sevenski's criminal trial. Because Sevenski's suit alleges excessive force, it would, if successful, necessarily imply the invalidity of his conviction. Second, excessive force is an affirmative defense under Michigan law to the resisting-arrest charge. *People v. Crigler*, No. 352594, 2021 WL 650489, at *7 (Mich. Ct. App. Feb. 18, 2021) (per curiam) ("[O]ne may defend a resisting-and-obstructing charge by proving that the officer or officers effectuating the arrest used excessive force." (citing *People v. Baker*, 338 N.W.2d 391, 392 (Mich. Ct. App. 1983))).

The majority is wrong to rely on either *Schreiber*, 596 F.3d at 335, or *Ruemenapp v. Oscoda Township*, 739 F. App'x 804, 809–10 (6th Cir. 2018), to conclude otherwise, *see* Op. at 11 n.4. Both cases rested on now-overruled Michigan precedent—namely, *People v. Ventura*, 686 N.W.2d 748, 752 (Mich. Ct. App. 2004). *See Schreiber*, 596 F.3d at 334–35 (citing *Ventura* and stating that "we cannot conclude that any excessive force used by Moe would have provided Schreiber with an affirmative defense to the charge of resisting arrest"). But after we decided *Schreiber*, the Michigan Supreme Court overruled *Ventura* in *People v. Moreno*, 814 N.W.2d 624, 625 (Mich. 2012). Per *Moreno*, Michigan law now expressly recognizes the "common-law right to resist *unlawful* arrests." *Id.* at 634 (emphasis added). *Ruemenapp* failed to recognize this change in state law, instead relying solely on *Schreiber*. *See Ruemenapp*, 739 F. App'x at 809–10 (citing that portion of *Schreiber* but omitting any citation to *Ventura*, which, by 2018, *Moreno* had already overruled). Since the elements of, and defenses to, Sevenski's conviction is an issue of state law, neither *Schreiber* nor *Ruemenapp* binds this court, and the majority is wrong to rely on those cases.

[7] Sevenski does not challenge the legality of that seizure—he brought only an excessive-force claim.

response to the cruiser's flashing lights, *see Torres v. Madrid*, __ U.S. __, 141 S. Ct. 989, 995 (2021) (stating that a seizure occurs, *inter alia*, upon "*submission* to the assertion of authority" (cleaned up)), the majority's observation that Sevenski "was never told that he was under arrest" is beside the point, Op. at 8.

The Supreme Court has confirmed what everyone already knows: "a traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will." *Johnson*, 555 U.S. at 333. Sevenski actively resisted the officers when he did just the opposite: exiting his vehicle without permission and ignoring the officers' orders to return.

And Sevenski further resisted the officers by making threatening (or, even to accept the majority's premise, merely "argumentative") statements and by refusing to comply with their orders to return to his vehicle. *E.g.*, *Slusher v. Carson*, 540 F.3d 449, 455–56 (6th Cir. 2008) (finding active resistance where the suspect "was *arguing* with the officers and *refusing to comply* with their request that she return [a] court order to them" (emphases added)). Based on that resistance, "it was reasonable for the officers to conclude that a brief show of force might be necessary to ensure [Sevenski] complied with their orders." *Id.* at 456.

The majority disagrees, holding that Sevenski's refusal to stop approaching the officers displayed merely "noncompliance" and that "is not the same as active resistance." Op. at 8 (citing *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013)). Instead, the majority says, active resistance requires noncompliance plus "'some outward manifestation' that suggests intentional defiance or blatant resistance." *Id.* (quoting *Kent v. Oakland County*, 810 F.3d 384, 392 (6th Cir. 2016)). There at least two fatal flaws in the majority's analysis.

First, Sevenski was not "noncompliant" in the way that term was used in *Eldridge* and *Kent*. *Eldridge* *was* merely noncompliant—he disobeyed orders *to exit* his vehicle; in doing so, "[h]e did not evince active resistance because he engaged in no aggressive or physical behavior[,] [and] 'the only individuals conveying any sense of aggression were the two officers.'" *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 612–13 (6th Cir. 2020) (quoting *Eldridge*, 533 F. App'x at 535). The same goes for Kent, who "had his arms raised and his back to the wall" when he was tased—"emphasizing his lack of active resistance to the officers." *Id.* at 613 (citing *Kent*, 810 F.3d at 388, 391–92). These cases illustrate a key distinction missed by the majority: there's a categorical difference between (1) disobeying an order to *affirmatively do something*, where that disobedience threatens little harm (as in *Eldridge* and *Kent*), and (2) disobeying an order to *stop doing something* that *already* threatens officer safety—like (as here) exiting a vehicle during a traffic stop, approaching the officers, and disobeying their orders to stop. The first is passive noncompliance; the second is active resistance.

Second, even if "some outward manifestation" suggesting "intentional defiance or blatant resistance" is required,[8] that test is easily met by the undisputed facts here. Sevenski *exited* his vehicle without authorization (itself resistance, *see Johnson*, 555 U.S. at 333), approached the officers (more resistance), *then* disobeyed orders to *stop* approaching and to return to his vehicle (yet more resistance). *See Kapuscinski*, 821 F. App'x at 613 (finding active resistance, and distinguishing *Eldridge*, where "it was Kapuscinski's refusal to comply with officer

---

[8] I'll offer one last quibble with the majority's gloss on *Eldridge* and *Kent*. Neither case set the bar for active resistance at "*intentional* disobedience or *blatant* resistance," unlike the majority's test. Op. at 8 (emphases added). Rather, they said that "active resistance could be characterized as 'noncompliance' that is coupled with 'some outward manifestation—either verbal or physical—on the part of the suspect [that] suggest[s] *volitional* and *conscious* defiance.'" *Kent*, 810 F.3d at 392 (alterations in original; emphases added) (quoting *Eldridge*, 533 F. App'x at 534). Whether an act is "intentional" or "blatant" seems to me a higher bar than "volitional" or "conscious," but the distinction likely doesn't matter here, because Sevenski's conduct meets that higher bar.

instructions . . . that prompted the" use of force). Those were outward manifestations sufficient to constitute active resistance. *See Eldridge*, 533 F. App'x at 535 (noting a "deliberate act of defiance using one's own body" constitutes active resistance). Moreover, both *Eldridge* and *Kent* recognized that mere "verbal showing[s] of hostility" can constitute active resistance. *Id.*; *Kent*, 810 F.3d at 392–93. So, Sevenski's statements that he "wish[ed]" he was armed and that he had a "bone to pick" with the officers—statements that any objectively reasonable officer would view as hostile and threatening, at least when said by someone who immediately exits his vehicle during a traffic stop—further show that Sevenski actively resisted the officers.

And if all that wasn't enough, there's more: Sevenski himself admitted, when testifying in his own defense in his state-court criminal case, that after Artfitch grabbed his hand, "I tensed up and I grabbed [Artfitch] back." Only *then* (and after Artfitch perceived an imminent punch to the face from Sevenski's other, free hand) did Artfitch take him to the ground. The majority fails to discuss this fact, but it alone shows one thing: even by Sevenski's own account, there's no doubt that he *physically* resisted Artfitch prior to the takedown. *See Rudlaff v. Gillispie*, 791 F.3d 638, 641–42 (6th Cir. 2015) ("Active resistance includes 'physically struggling with, threatening, or disobeying officers.'" (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012))). The majority's contrary conclusion ignores Sevenski's own admission, under oath, in state court.

*4. Balancing: Artfitch used minimal force.* All that aside, the level of force that Artfitch used (an arm-bar takedown) was modest under the circumstances, a fact that the majority elides. Artfitch used only the level of force necessary to overcome Sevenski's resistance—Sevenski has introduced no evidence showing that he "ceased to fight back" by the time Artfitch took him down. *See Slusher*, 540 F.3d at 456 (contrasting cases in which the plaintiff *stopped* resisting when the

force was applied). Sevenski has the burden to overcome qualified immunity, *id.* at 453, and without such evidence, he has not met his burden.

Remember what our task is here: to determine whether, considering the totality of the circumstances (in a light favorable to Sevenski but from the perspective of a reasonable officer on the scene without the benefit of hindsight), Artfitch used force that was objectively unreasonable as a matter of law. *See Plumhoff*, 572 U.S. at 774–78; *Dunn*, 549 F.3d at 353 (noting this is a question of law). If facts material to that question are genuinely disputed, such factual issues must be sorted out by the jury. But where, as here, the parties agree on every fact material to the reasonableness question, we may not affirm the denial of qualified immunity and simply leave for the jury to decide what was reasonable. *Kisela v. Hughes*, 584 U.S. __, 138 S. Ct. 1148, 1153 (2018) (per curiam).

But rather than earnestly analyze the *degree* of force that Artfitch used, the majority punts that duty to the jury. *See, e.g.*, Op. at 10 ("[A] reasonable jury could find Artfitch's use of force, or the amount of force used, objectively unreasonable."). Once again, that improperly lets hindsight define the constitutional violation. "An officer's use of force does not become constitutionally unreasonable merely because, after the dust has settled, we [or the jury] can imagine a more reasonable way for responding." *Miller v. Village of Pinckney*, 365 F. App'x 652, 655 (6th Cir. 2010); *Carter v. Carter*, 728 F. App'x 419, 423 (6th Cir. 2018) ("[T]hat the officers' use of force may not have been the only—let alone the best—method to secure Carter's arrest does not make it a constitutionally impermissible method of so doing."). We instead give "a measure of deference to the officer's on-the-spot judgment about the level of force necessary." *Burchett*, 310 F.3d at 944; *see also Dunn*, 549 F.3d at 353–54.

The majority implicitly bases its conclusion that Artfitch used excessive force on the fact that Sevenski suffered injuries from the fall. *See* Op. at 10, 13. But that misunderstands how we judge these cases. "[T]he critical question in Fourth Amendment cases is not the extent of the injury, but whether the force used by the law enforcement officer was gratuitous." *Earnest*, 841 F. App'x at 961 (citing *Miller v. Sanilac County*, 606 F.3d 240, 252–53 (6th Cir. 2010)). Even breaking the largest bone in the human body, the femur, from an officer's takedown does not render the takedown objectively unreasonable. *Dunn*, 549 F.3d at 355. It follows that Sevenski's injuries—injuries that, though not insignificant, were less severe than a broken femur—do not render Artfitch's takedown objectively unreasonable. And we have repeatedly blessed the arm-bar takedown maneuver before. *See, e.g.*, *Fox*, 489 F.3d at 237; *Bozung*, 439 F. App'x at 520–21; *Ryan*, 279 F. App'x at 337, 338–39. The majority makes no attempt, however, to explain why the maneuver was constitutional there but not here. It instead leaves that for the jury.

The majority says it must delegate this case to the jury because "a jury would likely be confronted with the parties' differing interpretations of the same material facts." Op. at 8. But mere differing interpretations of the same facts does not morph those facts into jury questions—otherwise, summary judgment would never be properly granted. *See, e.g.*, *Chappell*, 585 F.3d at 913 (noting that a "genuine issue of material fact" requires more than "plausible inferences drawn from a lack of conclusive evidence"). Consequently, what the majority treats as genuinely disputed factual questions—*e.g.*, how Sevenski's statements *could* be interpreted, whether he walked aggressively or placidly, among others—are nothing of the sort. Rather, when faced with an unrestrained, disobedient, and aggressive (both verbally and physically) driver during a traffic stop on a dark road, any reasonable officer would be justified in (a) fearing for his safety, and (b) physically overcoming the suspect's resistance. That leaves only the amount of force used, and

nothing suggests Artfitch used more force than necessary; even if it did, we generally defer to the officer's split-second judgment as to the amount of force necessary. *See Dunn*, 549 F.3d at 354. All told, when considering the totality of the circumstances, Artfitch's arm-bar takedown did not constitute excessive force.

## B.     The Alleged Constitutional Violation was not Clearly Established

Even if Artfitch used excessive force, that violation was far from clearly established under our cases, so he is entitled to qualified immunity on that ground. The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, __ U.S. __, 142 S. Ct. 9, 11 (2021) (per curiam). "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*."'" *Id.* (emphasis added) (quoting *District of Columbia v. Wesby*, 583 U.S. __, 138 S. Ct. 577, 590 (2018)). The rationale is a practical one: police officers often "must make split-second decisions in dangerous situations," and they "don't have the time to pull out law books and analyze the fine points of judicial precedent." *Howse v. Hodous*, 953 F.3d 402, 407 (6th Cir. 2020).

It follows that, because excessive-force cases turn "'very much on the facts of each case,' . . . *police officers are entitled to qualified immunity unless* existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (emphasis added) (quoting *Mullenix*, 577 U.S. at 13); *City of Tahlequah*, 142 S. Ct. at 11–12. Put differently, we must start in these cases with the *presumption* of granting qualified immunity—and deny it only if a prior case squarely demands otherwise.[9] *See al-Kidd*, 563 U.S. at 743.

---

[9] Only in rare circumstances (the majority does not appear to find such here) may we rest on our finding that a violation would be "obvious" to any reasonable officer. *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

Moreover, we may not retreat to the safety of mushy legalese—or abdicate the legal question of reasonableness to the jury—by denying qualified immunity merely because we think a *jury could* find that an officer's actions were "unreasonable." "Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Kisela*, 138 S. Ct. at 1153. But that's what the majority does here, repeatedly swapping obfuscation for clarity. For example, was *any* force objectively unreasonable here, or was only the *degree* of force unreasonable? Cryptically, the majority appears to say both. *Compare* Op. at 10 ("[A] reasonable jury could find Artfitch's use of force, *or* the amount of force used, objectively unreasonable." (emphasis added)), *with id.* at 11 (stating that the inquiry is "whether the officer 'could reasonably use the *degree* of force' that was employed" (citation omitted)).

The majority's most specific framing of the issue is that "an objectively reasonable officer would have been on notice that throwing Sevenski to the ground with enough force to cause the significant injuries he suffered constitutes excessive force." *Id.* at 13. What's wrong with that? First, it's still too general.[10] *Cf., e.g.*, *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (defining the issue as whether "using a taser repeatedly on a suspect actively resisting arrest and refusing to be handcuffed amounted to excessive force"). Second, no case cited by the majority or Sevenski (nor any that I can find) clearly establishes such a constitutional violation. In fact, our cases point in the opposite direction.

---

[10] For example, nowhere does the majority's issue statement mention that Sevenski exited his vehicle during a traffic stop without authorization, said threatening statements, approached the officers, ignored their orders to stop (so far as Artfitch could tell), and grabbed Artfitch's arm. Because all these facts are crucial to determining whether Artfitch used excessive force, they should be considered as part of the "situation he confronted." *City of Tahlequah*, 142 S. Ct. at 11 (citation omitted); *Rivas-Villegas v. Cortesluna*, __ U.S. __, 142 S. Ct. 4, 7–9 (2021) (per curiam).

Take *Howse* as one datapoint. There, we held it was *not* clearly unconstitutional for an officer to "tackle someone who disobeyed an order and then use additional force if they resist being handcuffed." *Howse*, 953 F.3d at 407; *see also id.* at 406 (describing the tackle as a "leg sweep"). If *tackling* a disobedient suspect is not excessive force, I fail to see how using an arm-bar takedown on a disobedient suspect is. *See Bozung*, 439 F. App'x at 516 (describing a "straight arm bar takedown" as a "soft empty hand control technique").

And *Howse* is no outlier; the balance of our cases compels the same result—even where, as here, the takedown caused significant injuries or knocked the suspect unconscious. *See, e.g.*, *Bozung*, 439 F. App'x at 514, 516, 520 (affirming grant of qualified immunity to an officer who used an arm-bar takedown during a traffic stop on a 54-year-old suspect with an already-fractured ankle; the suspect was "cooperative" and "not boisterous, combative, or disrespectful," and he suffered injuries from the takedown, including a "cervical cord contusion" and reduced use of his limbs); *Dunn*, 549 F.3d at 353–55 (affirming grant of qualified immunity to officers who forcibly removed suspect from vehicle, breaking the suspect's femur); *Ryan*, 279 F. App'x at 337, 338–39 (affirming grant of qualified immunity to officers who used an arm-bar takedown following a car chase and traffic stop, which caused the suspect to lose consciousness); *Earnest*, 841 F. App'x at 959, 960–61 (affirming grant of qualified immunity to an officer who repeatedly took a drunken suspect to the ground). At the very least, these cases show that whether Artfitch used excessive force was far from being "beyond debate." *al-Kidd*, 563 U.S. at 741.

The majority's primary cases, *McCaig* and *LaPlante*, do not change things, because they are "materially distinguishable from" the situation Artfitch faced. *Rivas-Villegas*, 142 S. Ct. at 7

(citation omitted).[11] In *McCaig*, two officers responded to reports of a fight outside a bar. While approaching, the officers saw McCaig hit someone in the face. Officer Raber told McCaig he was under arrest, "and McCaig responded by raising his hands over his head in a 'surrender motion,' and then holding out his hands to be handcuffed." *McCaig*, 515 F. App'x at 553. Raber grabbed both of McCaig's arms, then "'smacked' the handcuff on McCaig's left hand while holding McCaig's right arm." *Id.* McCaig responded that "he doesn't have to be rough with me. I'll go easily." *Id.* Raber then ordered McCaig to put his right hand behind his back, but he couldn't because Raber was still holding that arm. The two exchanged words, then "Raber screamed 'put your fucking hand behind your back,' yelling so loudly that it hurt McCaig's ear and McCaig 'jerked away.'" *Id.* Raber then executed a "leg sweep, 'slamm[ing]' McCaig to the ground back-first." *Id.* (alteration in original).

At least three key (and undisputed) facts distinguish *McCaig* from this case. First, *both* of McCaig's arms were already being held by Raber prior to the takedown, and "it is unreasonable to use significant force on a restrained subject, even if some level of passive resistance is presented." *Id.* at 555 (citation omitted). But here, Sevenski was unrestrained—and walking *toward* the officers despite their commands to stop. He thus posed an inherent threat to the officers because he was not under their control, unlike McCaig.[12] Second, McCaig "made no aggressive gestures or statements, attempted to cooperate, offered no resistance, and stated that he would 'go easy.'"

---

[11] Moreover, as this court recently held, *McCaig* cannot clearly establish law because it is an unpublished opinion. *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022) (holding that only published opinions "that would bind a panel of this court" can clearly establish law). But, for the sake of argument, I address *McCaig* nonetheless.

[12] Further, Artfitch testified that officers have "a safety advantage" when they are approaching a driver while he or she is seated in the driver's seat—such a driver "isn't able to as easily see us and our position in or outside of the patrol car as we attempt to make a safe approach" alongside the vehicle, and "it's usually more difficult for a person seated in a car to then strain their body . . . to look back and perceive us accurately." By exiting his vehicle and approaching the officers, Sevenski necessarily posed a safety threat.

*Id.* Here, by contrast, Sevenski began the encounter by immediately exiting his vehicle, while announcing his displeasure with the officers and his wish for a weapon. Such statements necessarily show an aggressive attitude far removed from McCaig's passivity. Third, it was Officer Raber—not McCaig—who initiated and escalated the hostility, first by "smack[ing]" the handcuff on one hand, then by unreasonably shouting in McCaig's ear to move the other arm, which Raber was *already holding*. Here, Artfitch did nothing to escalate the encounter until Sevenski forced his hand—first by exiting his stopped vehicle without being asked to, then by refusing to heed the officers' orders to return to his vehicle, continuing to approach until he was within arm's length of Artfitch.

These factual differences underscore why the majority's reliance on *McCaig* is so misplaced. The majority may, in the abstract, be right that using "force on a suspect who poses no serious threat to law enforcement can be excessive." Op. at 12. But to say that Sevenski posed as little a safety threat as did McCaig is implausible—no matter in what light the facts are viewed. *LaPlante*'s facts showcase the same point: though detained in a traffic stop, the plaintiff there was neither approaching the officers nor spouting threatening statements, and he raised his hands in a "surrender" position prior to the takedown. *LaPlante v. City of Battle Creek*, 30 F.4th 572, 580–81 (6th Cir. 2022). "[A] reasonable officer could miss the connection between th[ose] case[s] and this one," so *McCaig* and *LaPlante* did not clearly establish the alleged constitutional violation here. *City of Tahlequah*, 142 S. Ct. at 12.

Similarly, each of the other cases cited by the majority involved suspects who, for varying reasons, posed little or no threat to officer safety.[13] *None* of those cases involved a traffic stop, and none involved a driver who exited his vehicle without authority to do so, made threatening statements to the officers, approached them, and disobeyed their commands to stop approaching. This case is much more like *Bozung, Howse*, *Ryan*, *Dunn*, or *Earnest*—where the suspects posed a risk (however minimal) to officer safety, and where the officers used a level of force similar to

---

[13] In *Lawler*, the plaintiff was not on the side of a dark rural road (as here), but in a secure booking room—a setting that we noted was "beyond the point at which any threat could have been reasonably perceived." *See Lawler v. City of Taylor*, 268 F. App'x 384, 388 (6th Cir. 2008). An arrestee poses only so much danger in such a secure setting, particularly where a videotape showed that the plaintiff "never raised [his hand] in a menacing way." *Id.* at 387. But Artfitch was in a much less secure setting—a traffic stop, which is "especially fraught with danger to police officers." *Johnson*, 555 U.S. at 330 (quoting *Long*, 463 U.S. at 1047). In *Pershell*, the suspect was not approaching the officers—and they outnumbered him by five-to-one—which moderated whatever safety threat he posed; further, the officers were the initial aggressors, with one inexplicably pointing a taser at the suspect from the outset, escalating the situation. *Pershell v. Cook*, 430 F. App'x 410, 412 (6th Cir. 2011).

*Smith* is easily distinguishable as well. Unlike here, the plaintiff there was having an observable epileptic seizure (his pants were down; he was completely unresponsive to the officers' commands, instead continually yelling "Baby;" and visibly sweating in cold weather, which the officer noticed at the time), and he was not advancing toward the officer at the time of the takedown. *Smith v. City of Troy*, 874 F.3d 938, 942 (6th Cir. 2017). The case did not involve a traffic stop—and the plaintiff had *already* exited his vehicle by the time the officers arrived; by then, he was standing still, grasping a fence. *Id.* Indeed, the officer there did not even *claim* that the plaintiff posed a safety threat. *Id.* at 945. That's not what we have here: Sevenski exited his vehicle immediately after being detained in a traffic stop, made lucid but threatening comments, and ignored the officers' orders to stop approaching.

The plaintiff in *Baker* likewise posed "*no* safety risk" to the officers because he had "his hands straight up in the 'surrender' position" *after ending* his earlier flight from the police. *Baker*, 471 F.3d at 607 (emphasis added). The officer then clubbed the plaintiff on the head, and then again on his knee while on the ground, adding, "that's for running from me." *Id. Of course* that's excessive force. But it's quite unlike the fact pattern here—where Sevenski not only did not have his hands in the "surrender" position, but also continued to advance on the officers, while threatening them, despite their orders to stop. That resistance (and resulting threat to officer safety) was far removed from Baker's obvious surrender and the gratuitous violence he was then subjected to.

*Aldrich* is an unpublished district-court decision, so it cannot clearly establish law. *Bell*, 37 F.4th at 368. At any rate, it is factually distinguishable too. The suspect there was not pulled over in a traffic stop, and he was already outside his vehicle when the officer pulled up, so his disobedience (disobedience that was warranted given the officer's unreasonable conduct and orders) was only so threatening. *Aldrich v. City of Columbus*, No. 2:15-CV-404, 2016 WL 6084570, at *1 (S.D. Ohio Oct. 18, 2016). Further, the officer was the initial aggressor there—he continued to take steps *toward* the suspect while barking orders, and he admitted to knocking the suspect's cigarette from either his hand or mouth, before taking him to the ground. *Id.* Again, like *McCaig*, that's the opposite of what we have here—where Artfitch did nothing to escalate the situation until Sevenski forced his hand.

Finally, the majority does not explain why it relies on *Mattos*, which was a tasing case that *granted* qualified immunity because "there were three circuit courts of appeals cases [with analogous fact patterns] rejecting claims that the use of a taser constituted excessive force," so the constitutional violation was not clearly established. *Mattos v. Agarano*, 661 F.3d 433, 448 (9th Cir. 2011) (en banc). *Mattos* only supports my position: at least *five* cases (those I've cited above), with facts analogous to the situation Artfitch confronted, held that the officers *were* entitled to qualified immunity. Hence, the alleged violation here was not clearly established.

(or greater than) that used by Artfitch. Consequently, no case gave Artfitch fair notice that his takedown was unconstitutional in the situation he faced, which entitles him to qualified immunity.

For those reasons, I respectfully dissent from the denial of qualified immunity. I concur, however, in the dismissal of Sevenski's cross-appeal.